**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHER DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **MARC KRAMER, KIRIL TRAJCEVSKI,** ) | |
| **MATT NYMAN, on behalf of themselves and** ) | |
| **all other similarly situated,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No. 11 C 8758** |
| **v.** ) | |
| ) | **Judge John Lee** |
| **AMERICAN BANK AND TRUST** ) | |
| **COMPANY, N.A., SHARON WHEELER,** ) | **Magistrate Judge Jeffrey Cole** |
| **JULIE KLAUS, HARRY S. COIN and** ) | |
| **DALE DOLLENBACHER,** ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM OPINION AND ORDER**

**I.**

**INTRODUCTION**

The American Bank and Trust Company, N.A. (the Bank) has moved to disqualify plaintiffs'

counsel, Ari Karen. [# 141]. Judge Lee has referred the motion here for resolution. [#147]. 28 U.S.C.

§636(b)(1)(A); Rule 72(a), Federal Rules of Civil Procedure.

Regrettably, disqualification motions have become common tools in litigation, often being

used for purely strategic purposes and to harass. *See Richardson–Merrell, Inc. v. Koller,* 472 U.S.

424, 436 (1985); *In re BellSouth Corp.,* 334 F.3d 941, 961 (11ᵗʰ Cir. 2003); *Freeman v. Chi. Musical*

*Instrument Co.,* 689 F.2d 715, 722 (7th Cir.1982); *Allegaert v. Perot,* 565 F.2d 246, 251 (2d

Cir.1977). Thus, motions for disqualification are not favored and should not be casually granted.

*Melamed v. ITT Cont'l Baking Co.,* 592 F.2d 290, 295 (6th Cir.1979); *Fred Weber, Inc. v. Shell Oil*

*Co.,* 566 F.2d 602, 609 (8th Cir.), *cert. denied,* 436 U.S. 905 (1977); *Panduit Corp. v. All States*

*Plastic MFG. Co.,* 744 F.2d 1564, 1576–77 (Fed.Cir.1984). As I noted at the evidentiary hearing,

I do not think the motion was made in bad faith or to gain a tactical advantage.  (R. 249).

The Bank's motion stems from an encounter one of the Bank's managing consultants – Sharon Wheeler – had with Mr. Karen at a seminar he was giving on loan officer compensation in Chicago in September 2010 – a year before the present litigation. According to the Bank, just before Mr. Karen was to speak, Ms. Wheeler, in the public atrium outside the auditorium where he was to speak, Ms. Wheeler shared confidential information of the Bank with him, regarding wage and hour issues, and he provided legal advice to her.  It is the Bank's contention that as a consequence, an implied lawyer/client relationship came into being, and since this case is a wage and hour case, a conflict of interest exists requiring the disqualification of Mr. Karen, his law firm, his co-counsel, and his co-counsel's firm. Plaintiffs, of course, see it very differently.

As it was Ms. Wheeler's word against Mr. Karen's, an evidentiary hearing was required so that the credibility of the  two witnesses could be properly assessed. *See, e.g., Tellabs Operations, Inc. v. Fujitsu Ltd.*, 882 F.Supp.2d 1053, 1056 (N.D.Ill. 2012).[1]  That assessment turns on the plausibility of the testimony, the shifting and vacillating explanations for conduct, uncertain, inconsistent, and clashing memories, the inconsistencies between testimony and objective evidence, the internal inconsistencies within testimony, and the extent to which documents or objective evidence may contradict or support the witness's story. *See Anderson v. Bessemer City,* 470 U.S. 564, 574-75 (1985); *Mitondo v. Mukasey,* 523 F.3d 784, 788 (7th Cir. 2008); *United States v. Bradford,* 499 F.3d 910, 920-21 (8th Cir.2007); *Kadia v. Gonzales,* 501 F.3d 817, 820 (7th Cir.2007); *Pinpoint, Inc. v. Amazon.Com, Inc.,* 347 F.Supp.2d 579, 583 (N.D.Ill.2004) (Posner, J.)(sitting by

---

[1]Due process may entitle the parties to an evidentiary hearing to resolve relevant factual disputes. *Tranzact Technologies Inc. v.) 1Worldsite*, 406 F3d 851, 855 (7th Cir. 2005);  *1SourceUnited States v. Berg , 20 F.3d 304, 311 (7th Cir. 1994); Alexander v. Chicago Park Dist.,* 927 F.2d 1014, 1025 (7th Cir.1991), *cert. denied,* 503 U.S. 905 (1992).

designation).

In addition, demeanor and inflection can be critical components of the decision whether to believe a witness. *Anderson,* 470 at 575 (1985); *United States v. Schiro,* 679 F.3d 521, 532 (7th Cir.2012); *United States. v. Smith,* 668 F.3d 427, 430 (7th Cir.2012). Indeed, "the demeanor of a witness...may satisfy the tribunal not only that the witness' testimony is not true but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." *NLRB v. Walton Mfg. Co.,* 369 U.S. 404, 408 (1962).[2]

Since "[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant," *Upjohn Co. v. United States,* 449 U.S. 383, 390-91 (1981); *see also Sandra T.E. v. South Berwyn School Dist.*, 100 600 F.3d 612, 619 (7th Cir. 2010), we begin with the evidence adduced at the evidentiary hearing.

## II.
## FACTUAL BACKGROUND

### A.
### Mr. Karen's Version Of His Encounter With Ms. Wheeler

At the hearing, Mr. Karen explained that he was a frequent presenter at seminars like the one for the Illinois Mortgage Bankers Association in September, 2010 in Chicago. (R. 34). When he began giving the presentations, the intended audience was mortgage banks or bank representatives, but this grew to include loan officers. Indeed, the representation of loan officers in the audiences

---

[2] Of course, this does not mean that disbelief of a witness is a substitute for proof. *Cf., Moore v. Chesapeake & O. Ry. Co.,* 340 U.S. 573, 576 (1951); *United States v. Zeigler,* 994 F.2d 845 (D.C.Cir.1993).

prompted Mr. Karen to tweak the presentation a bit. (R. 34). The presentation in question was focused on amendments to the Truth in Lending Act's regulation covering payment to loan officers: they could no longer be paid on the "percentage of the revenue derived in loans that they closed." (R. 34-35).[3]

One of Mr. Karen's aims in conducting these talks was to generate business – to get mortgage lenders to hire him to advise them about compensation plans. (R. 37). He didn't get paid to speak, but he hoped that he would raise his profile and marketability in the industry, a not uncommon goal of speakers at CLE-type seminars. (R. 37). He would meet people at the presentations, and if they contacted him, he'd follow up with them. (R. 43). He said that he didn't necessarily make himself available to people before his presentations, but that day someone did come up to him while he was sitting and preparing his speech. (R. 38). He didn't find out until this litigation was well under way who she was – Ms. Wheeler. (R. 38).

Ms. Wheeler had never met or spoken with Mr. Karen before that day. When she saw him, he was sitting at a table in the atrium outside the auditorium in which he was to speak. That area was open to the public and was filled with tables and chairs. Ms. Wheeler pulled up a chair at the table at which Mr. Karen was preparing his presentation and sat down and began talking to him. (*See* Plaintiff's Exs. 2s-2c, which are color pictures of the area). That table – and the others surrounding

---

[3] Mr. Karen was an exasperating witness, who sometimes refused to concede the obvious. For example, on this topic, he refused to say that his presentation covered "how loan officers could be paid" under the new regulations. He claimed that description was too broad – his presentation was very specific. He likened the question to asking someone whether they lived on Earth when they lived in Silver Springs, Maryland. But, as counsel for The Bank pointed out, Silver Springs is, indeed, on Earth. Mr. Karen responded – oddly – that that was exactly his point. He said that was the most accurate answer he could give (R. 36), before finally conceding that he "talked about how the laws had changed and how that would affect the way loan officers could be paid." (R. 37). It was an exchange reminiscent of a Lewis Carroll story. *See also infra* at 6.

it – were in a public area immediately adjacent to the public thoroughfare. Any conversation between Mr. Karen and Ms. Wheeler could be overhead by passersby. There were between 125 and 200 people who attended the presentation, and there were people walking past the tables at various times while Mr. Karen was preparing his remarks and while he was speaking with Ms. Wheeler.

Mr. Karen testified that he arrived in Chicago only about an hour before he was to speak and thus had little time to work on his presentation. He said that the sponsor of the event had asked him to edit certain aspects of his presentation which he agreed to do and which he was working on at the time Ms. Wheeler approached him. The two spoke for about ten minutes.[4] He said that he asked no questions about the Bank, and that he never provided any kind of legal advice to Ms. Wheeler. In fact, he said, at these seminars his guard is always up, and that he is careful never to give legal advice because it can be misconstrued and can create unintended conflicts. (*See also* Defendant's Ex. 7, ¶15). In fact, Mr. Karen said he did not recall if Ms. Wheeler even told him who she was with.

Mr. Karen said that the scope of his conversation was general in nature. Ms. Wheeler's focus was on the subject and content of the seminar, because she said she couldn't stay for the whole thing and thus wanted to get information about what was going to be said. She asked if it would cover minimum wage overtime. Mr. Karen told her that it would, but said he was asked to take out certain parts because a number of loan officers were going to be in attendance. He said there were no specific questions about the Bank, and no inquiries about his background. He said much of the discussion involved an exchange of pleasantries. He was emphatic that he never provided any legal advice to Ms. Wheeler. He said that not only would he not have done that under any circumstances,

_____

[4] The exact duration of the conversation is somewhat unclear. Mr. Karen placed it at 7 to 8 minutes of actual speaking time, with the entire encounter spanning perhaps 15 minutes. Ms. Wheeler did not dispute the length of the entire encounter, she simply accorded more time for speaking to Mr. Karen.

but he noted that there were people in the area of the table where they were sitting; some were seated at other tables; others were walking around.

Mr. Karen said he was "usually not allowed" to record contact information from attendees and claimed he did not take contact information from Ms. Wheeler. (R. 43). But, in the next breath, he conceded that he took her email address in order to send her a copy of the PowerPoint presentation because she couldn't stay for the whole thing. (R. 43).[5] Although he had stated in his affidavit that he gave her his business card, he didn't recall doing that. (R. 82). Mr. Karen wouldn't say whether Ms. Wheeler was part of his target client group. (R. 44). She was "in the universe of people [he] theoretically represent[ed]"; actually, not her, but her bank. (R. 44).

Mr. Karen stated that he didn't think Ms. Wheeler worked for a bank at the time, despite having her email and giving a presentation that he said was targeted to mortgage banks, bank representatives, and bank loan officers, all of whom would work for banks.

Q. And her email said ambankqc, right?

---

[5] Q. And it was your practice to record the business contact information for attendees at these types of presentations?

A. I usually am not allowed to do that, actually, no.

Q. You did that in this case, right?

A. No.

Q. You didn't record anything concerning Miss Wheeler and her information?

A. I believe she didn't have a business card, and I believe she gave me her email address to send her a Power Point. Or maybe like a phone number. . .and there was some information, I don't remember what it was, that she gave me. I don't know if it was a phone number or an email or something like that. . . . .

Q. So you got some of her business contact information?

A. Sure, yeah.

A. If that's what it said, sure, I don't remember.

Q. And then when you exchanged emails the day after, that actually had her signature block that said "American Bank," right?

A. If you say so. The way it would show on my screen, and I'm honestly notorious I don't scroll down, I should more, it's got me in trouble, but it would be there. I don't know if I saw it though.

(R. 45).

Mr. Karen did not deny he saw it, but claimed it didn't register. (R. 86). He said he did not attach her name to the Bank. In fact, he claimed two weeks later he didn't remember meeting her. (R. 91-92). He explained further that he "wouldn't say [he] forgot the conversation, but [he] certainly didn't associate that conversation at that time with American Bank & Trust or Sharon Wheeler or really have a recollection of who she was . . . ." (R. 93). It wasn't the discussion that he couldn't recall, it was who he had it with relevant to this case. (R. 93). Some of this testimony is not credible given Ms. Wheeler's title plainly appearing on the e-mails that they exchanged the next day.

The same is true of other aspects of Mr. Karen's testimony, where he refused to admit what appeared obvious. *See supra* at 4, n.3. In fact, during the hearing, I commented on this. (R. 68). While I do not credit Mr. Karen's testimony on these points, it does not change the outcome, since disbelief of one facet of testimony does not preclude crediting other aspects. *Kadia v. Gonzales,* 501 F.3d 817, 821 (7th Cir. 2007).

Mr. Karen described Ms. Wheeler as a "bit pushy." He said he was trying to put the finishing touches on his presentation, and she kept interrupting him with questions. (R. 45). But he was "trying to be polite and nice and everything." (R. 45). Although he was trying to politely brush her

off, she didn't get the hint and was relentless. (R. 94). The Bank does not deny this characterization, which, as we shall see, bodes unfavorably for Ms. Wheeler's story.

Ms. Wheeler asked whether his presentation would be covering wage and hour issues with loan officers. (R. 50). Mr. Karen explained that it usually did, but that he had taken that part out due to the attendance of so many loan officers. (R. 50, 80). That's why she specifically if he could send her a copy of the unedited version, which would have covered those issues. (R. 50, 80, 85). Mr. Karen explained that he did not discuss the substance of the deletions with Ms. Wheeler, only the fact that deletions had been made. (R. 54). When he emailed a copy of the originally planned presentation to Ms. Wheeler the next day, in response to an email request from her (Defendants' Ex. 6), he said that it included the points that had been deleted. (R. 61, 77-78).[6]

Mr. Karen testified that the conversation with Ms. Wheeler lasted about ten minutes, but that it was fragmented because he was trying to finalize his presentation. (R. 75). About 75% of the ten minutes was spent in conversation. (R. 76). Mr. Karen said Ms. Wheeler didn't ask about minimum wage and overtime issues, but only asked if his presentation would cover them. (R. 80). Mr. Karen felt that the more time one spends talking to an individual at an event, the less chance that it will develop into a hiring. (R. 83). He has found that the people "that want to hire [him] usually don't want to talk to me a long time in front of other people." (R 83-84). He wasn't comfortable providing information in that milieu because even a cursory discussion might be regarded as advice. As a result, he had his guard up in such situations. (R. 84).

---

[6] The Bank's Reply brief seeks to make much of the fact that Mr. Karen sent the unedited version of his presentation but puts out of view the request by Ms. Wheeler for that version. I credit Mr. Karen's explanation in this regard. But even if he sent the unedited version unsolicited, it would not be sufficient to prove that she confided confidential information to him in response to which he gave her legal advice. From their discussion about the various "scenarios" that people were "throwing out," *see infra* at 11, Mr. Karen would obviously have known that Ms. Wheeler would have an interest in the unedited version.

## B.

## Ms. Wheeler's Version Of Her Encounter With Mr. Karen

Ms. Wheeler's version of the events differed drastically from Mr. Karen's. The question is who was telling the truth. That depends on who was more credible. *United States v. Sutton,* 337 F.3d 792, 801 (7th Cir. 2003); *United States v. Akram,* 152 F.3d 698, 702 (7th Cir. 1998). "When a trial judge's finding is based on his decision to credit the testimony of one of two ... facially plausible stories that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Xodus v. Wackenhut Corp.,* 619 F.3d 683, 687 (7th Cir. 2010). "Credibility determinations based on the plausibility of competing accounts are factual findings that are overturned on appeal only if clearly erroneous." *United States v. Thornton,* 197 F.3d 241, 247 (7th Cir.1999).

"The clearly erroneous standard is a high one to meet; '[t]o be clearly erroneous, a decision must strike us as more than just maybe or probably wrong; it must ... strike us as wrong with the force of a five-week-old, unrefrigerated dead fish.'" *Piraino v. International Orientation Resources, Inc.,* 137 F.3d 987, 990 (7th Cir. 1998).

As we shall see, Ms. Wheeler's version of events is not only facially implausible, but it is contradicted by extrinsic evidence and by her own behavior. It was, in short, if not a tale spun for the occasion, interwoven with contrivances and exaggerations.

The evidence revealed that Ms. Wheeler was an intelligent, and sophisticated businesswoman, who had been in the mortgage business for 42 years. (R. 155). She began as a teller, and rose to become an Executive Vice President. At the time of the hearing, she was the Bank's Managing Consultant, reporting to one of the Bank's senior officials, Mr. Allen. (*See*

Plaintiff's Ex. 1). The Bank brought her in to assess the mortgage department, and she ended up running it. (R. 156); *Bank's Reply* at 2. She had the authority to hire people, set compensation structure, determine policy, and "manage process, engage attorneys for potential lawsuits." (R. 160).[7]

She said that she attended Mr. Karen's seminar because he was "considered an expert" on the new loan officer compensation issues, and she "wanted to hear what he had to say." (R. 161). She said she "needed to have clear . . . what was legally correct in order to continue paying the loan originators as they were." (R. 161). She conceded that she wasn't particularly familiar with Mr. Karen's name, and that she simply took the word of the Mortgage Bankers Association that he was an expert because he was speaking at one of its programs. She knew nothing about his firm, or his rates, or if he was accepting clients when she met with him in the atrium. She conceded she never did anything to get permission to hire Mr. Karen either before meeting him or thereafter. (R. 219-20).[8]

It ought be parenthetically noted at this juncture that I do not credit Ms. Wheeler's testimony that she provided confidential information about the Bank's loan officer compensation practices and that she sought and obtained legal advice from Mr. Karen. A sophisticated person like Ms. Wheeler would not have gone to a public seminar attended by hundreds of people, conducted by a person she did not know and with whom she had no prior dealings and confide in that person confidential information about her employer to obtain "legal advice" as to what was "legally correct" about a

---

[7] She explained that "she did the legwork and would recommend" an attorney; final say would come from higher-ups. (R. 193). When there was a lawsuit touching on the area she was involved in, she would monitor the progress of the case. (R. 194, 209).

[8] The transcript of the hearing is to be found at Docket #204-12.

critical problem facing the Bank.[9]

Ms. Wheeler explained that she saw Mr. Karen walk into the atrium and sit down. She "saw an opportunity" and sat down and "went and "buttonholed him." (R. 163). At first, she sat a couple of tables away from him. (R. 164). She then pulled up a chair, not at the table where he was sitting, but at the table but next to it. (R. 165). Ms. Wheeler initially testified that everyone else was in the seminar – Mr. Karen was not the first speaker – so she and Mr. Karen were the only ones in the atrium. (R. 166). A moment later, she admitted that there were people walking through the atrium. (R. 166). This was Mr. Karen's recollection as well.

Ms. Wheeler introduced herself to Mr. Karen, said she was from the American Bank, that she had a couple of compensation questions, and asked whether she could "pick his brain." (R. 167). That is quite different from saying she wanted specific legal advice from him on a problem confronting her employer. In fact, she testified that "it was at the very beginning where people were just throwing out different versions, would this work, would that work under the new regulation." (R. 162). She said that:

> The crux [of the conversation] was the Dodd Frank loan officer compensation, new regulation that was taking effect. It was brand new, and so there was a lot of scenarios people were throwing out of what would pass the regulation guidelines and does this meet the requirements or would it be kicked back.

(R. 168). Ms. Wheeler said the conversation lasted ten or fifteen minutes. (R. 168).

Because of what the defendant considered to be attorney-client privilege, Ms. Wheeler was not allowed to testify as to any information she might have shared with Mr. Karen. (R. 169-70). So the exchange went like this:

---

[9] This is not to say that an implied professional relationship can only arise in the context of a lawyer's office. It can arise, under the right circumstances, anywhere. But that is not what happened in this case.

Q. Were you asking Mr. Karen's advice in the conversation?

A. Yes.

Q. Was he giving it to you?

A. Yes.

Q. About your what-ifs?

A. Yes.

Q. So what should the bank do in this scenario?

A. Yes.

*    *    *

Q. How did the interview end?

A. Well, I was talking to him, you know, I was asking him several different scenario questions and what would work, what would not. He gave me advice on a couple of different things, and I ended the conversation with that can I follow up with him because I needed – we needed a whole new contract being written, and I needed someone with this expertise to write the contract. So my intention was to follow up with him, see what his rate was, if he does this, write the contract along with what would pass regulatorywise. So my intention was if, if he was available, yes, I was going to hire him. Or I shouldn't say that. Actually, I was going to follow through to see if we could hire him.

(R. 171).

Mr. Karen gave her his card, and Ms. Wheeler said she then attended the presentation. (R. 171). She did not come right out and hire him on the spot, (or even hint at that),[10] although she claimed after speaking with him it was her "intention" and her "goal" "to hire him" if he was available. (R. 170, 219; Reply Brief at 5). She said that this man whom she had never met before and about whom she knew essentially nothing was her "first choice" to do the work for the Bank.

---

[10] It is not clear from Ms. Wheeler's testimony whether she ended the conversation by asking whether she could contact him or whether she, in fact, told him that the Bank needed a new contract being written and that it needed someone with his expertise to write it. (R. 170).

(R. 224). She didn't know if he was taking on clients or what his rates were. (R. 219). And she did not ask – either then or ever. The next day, Ms. Wheeler sent an email to Mr. Karen, requesting a copy of the presentation, which Mr. Karen immediately forwarded to her. (R. 172). She said she would contact him later. (R. 171-72).

In regard to whether she shared confidential information with Mr. Karen, Ms. Wheeler said she shared aspects of the Bank's loan officer payment practices with him. (R. 211). But she conceded that these would be known to current, former, and prospective loan officers as well. (R. 212). *She also admitted that she would not disclose confidential information in front of the Bank's competitors and there may have been some in the atrium.* (R. 217).

Ms. Wheeler testified at the hearing that in the course of "picking Mr. Karen's brain," she presented "different scenarios" to him. But abstract discussions about hypothetical "scenarios people were throwing out" is a far cry from the seeking and giving of legal advice on a particular problem. The requirements that must be met before an implied professional relationship can come into being are far more exacting. *See infra* at 20. And while she claimed that she communicated confidential information about the Bank, she admitted that there were competitors of the Bank at the presentation, and that she didn't know whether there were loan officers in the vestibule. Of course, if there were, they could have overheard her supposed transmissions of confidential information – which, of course, would pose a risk to the Bank – something Ms. Wheeler would never have done. In any event, I do not credit her claim that she provided Mr. Karen with confidential information.

The events of September 28th, the day after the seminar, are singularly instructive in assessing Ms. Wheeler's credibility and her version of events as recounted at the hearing. On September 28, Ms. Wheeler e-mailed Mr. Karen:

Ari,

Thank you for taking the time to discuss the new loan officer compensation regulations with me yesterday. Please forward your presentation to me when you have a chance. I will be following up with you regarding putting to gather a workable plan in the near future. Thank you, Sharon Wheeler, Managing Consultant, Residential Lending.

Significantly, there is nothing in this email remotely supportive of Ms. Wheeler's version of her encounter with Mr. Karen. She merely thanked him for "discuss[ing] the new loan officer compensation regulations" with her. There is no expression of thanks for his (claimed) legal advice, which she was taking "seriously." Nor does the email refer to any discussion about the Bank's particular situation and issues confronting the Bank. Quite the contrary. The laconic e-mail is far more consistent with Mr. Karen's version of what occurred than Ms. Wheeler's. It is nothing more than a continuation of Ms. Wheeler's attempt to pick Mr. Karen's brain.

Equally unsupportive of Ms. Wheeler's claim that confidential information was shared with Mr. Karen is his immediate response:

Sharon, nice meeting you as well. Attached is the version of the presentation without the deletions that I mentioned to you yesterday. This does not address in great detail the overtime and minimum wage issues, but we can address discuss them when it is convenient for you. I look forward to hearing from you in the future.

(Dkt. # 204-5). His email does not advert to the supposed exchange of confidential information or the giving of legal advice to Ms. Wheeler or to his desire to represent the Bank, which one would have expected had Ms. Wheeler supplied him with confidential information and had he given her legal advice.

But even more revealing and more detrimental to Ms. Wheeler's story are a series of e-mails to her colleagues at the Bank with whom she was working on the loan officer compensation issue. According to the Bank, on September 28th, the day after Mr. Karen's presentation, "Ms. Wheeler

began the process of updating the Bank's decision-makers who could approve hiring Mr. Karen."

(Reply Brief at 5). Of course, the evidence disproves the claim. On the 28th, after emailing Mr.

Karen, Ms. Wheeler emailed Julie Klaus, the head of HR: "Julie, this is a copy of the presentation

I went to yesterday regarding LO compensation. fyi."(Defendant's Ex. 5).

What is significant about the e-mail is what it does not say: there is no mention of Mr. Karen;

no mention of her "goal" to hire him as the Bank's lawyer; no mention of her having conveyed

confidential information to Mr. Karen, or of having received legal advice from him, which she took

"seriously." Indeed, the email is curiously silent given what Ms. Wheeler claimed occurred in the

atrium outside the seminar.[11]

Ms. Wheeler conceded at the hearing that she did not say anything to Ms. Klaus in the email

about what is now claimed to have been so critical and significant an encounter. She insisted,

however, that she did ultimately tell Ms. Klaus about Mr. Karen's legal advice:

> Q. You don't have any memory of telling Mrs. Klaus about the oral advice that Mr. Karen gave you in the atrium, do you? The lobby.
>
> A. I did. It wasn't right after. It was -- it was later. It was -- when Sharon -- when you say when I returned, I did -- I just forwarded her the presentation. As we were working on the contract, the contracts were coming to renewal January 1. So while we were in the process, later on I did.
>
> Q. You disclosed the oral advice that Mr. Karen gave you?
>
> A. Right.[12]

---

[11] The fact that the presentation accompanying the email included the deletions and the overtime minimum wage issues (Reply Brief at 4) signifies nothing other than her request to Mr. Karen that he send her the original unedited version of his presentation.

[12] In a Declaration filed on March 22, 2013 in this case (Defendants' Exhibit 9), Ms. Wheeler said she "shared confidential information with Mr. Karen about specific aspects of American Banks payment practices with respect to loan officers, including practices relating to wage and hour matters." She was

(continued...)

(R. 215).

I find this testimony false.

Ms. Wheeler's claim that she ultimately told Ms. Klaus that she had passed on confidential information and had received legal advice from Mr. Karen is flatly contradicted by Ms. Klaus's deposition. (Plaintiff's Ex. 7).[13] As Ms. Klaus unequivocally testified, when she met with Ms. Wheeler after Mr. Karen's presentation, Ms. Wheeler made no mention of the conversation with Mr. Karen. Nor did she ever say that her goal was to hire Mr. Karen if he was available. (R. 170; Reply Brief at 5). In fact, she never mentioned Mr. Karen at all. The only conversation about obtaining counsel for the project relating to the loan officer compensation issue dealt "with people Ms. Wheeler knew in Chicago." (At that time, DiLongio & Shapiro were doing the Bank's work. And, in fact, they ultimately did the legal work that she claimed she envisioned Mr. Karen would do. (R. 220)). There was "never a conversation that" Ms. Wheeler had with Ms. Klaus in which she said that she had conveyed confidential information about the Bank or that Mr. Karen had given her legal advice. Ms. Klaus was clear that Ms. Wheeler never told her what was said between her and Mr. Wheeler. (Plaintiff's Exhibit 7 at 14– 15).

Also on the 28th, Ms. Wheeler emailed two other Bank officials -- with a cc to Ms. Klaus and to Dale Dollenbacher, who is a defendant in this case. The subject of the email was "loan officer compensation":

---

[12](...continued)
adamant that she "shared this information for the specific purpose of obtaining Mr. Karen's legal advice and recommendations." She did not claim that she shared this purpose with Mr. Karen. She said that Mr. Karen responded to her comments "by giving me legal advice regarding how the American Bank could insure compliance with wage and hour laws." Although she had never met Mr. Karen before, she said she "took his advice seriously." I do not find these statements credible.

[13] The Bank chose not to call Ms. Klaus as a witness at the hearing.

"I went to a presentation yesterday on how the new regulation that goes into effect April of next year will impact the way we pay our loan consultants. Attached is [sic] the slides from the attorney who was the guest speaker. He offers a very similar plan as what we offer today. This is an opportunity to make the necessary changes we need to make. After all the month end and excitement is over, let's take some time to review our options."

(Defendants' Ex. 6).

This email, like the one to Ms. Klaus, does not support Ms. Wheeler's contention that she had "shared confidential information with Mr. Karen about specific aspects of American Banks payment practices with respect to loan officers, including practices relating to wage and hour matters," and that she did so "for the specific purpose of obtaining Mr. Karen's legal advice and recommendations." Nor does the email refer to legal advice given by Mr. Karen during their discussion. (Defendant's Ex. 8 at ¶9, Declaration of Sharon Wheeler, 3/12/13). Quite clearly, the reference to Mr. Karen offering a very similar plan to the one the Bank used refers to the content of the Powerpoint presentation which accompanied the email.

The omissions in the emails bear significantly on Ms. Wheeler's credibility under the doctrine of impeachment by omission. "The theory of impeachment by omission is that 'if [a] former statement fails to mention a material circumstance presently testified to, which it would have been natural to mention in the prior statement, [then] the prior statement is [considered] sufficiently inconsistent to be admitted to impeach the present testimony." *United States v. Useni,* 516 F.3d 634, 652 (7th Cir. 2008). *See also*, *Jenkins v. Anderson*, 447 U.S. 231, 239 (1980)("Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted.");*United States. v. Fonville*, 422 Fed.Appx. 473, 482-483, 2011 WL 1777302, 9 (6th Cir. 2011); *United States v. Meserve*, 271 F.3d 314, 320–21 (1st Cir.2001); *Moylan v. Meadow Club, Inc.,* 979 F.2d 1246, 1249 (7th Cir.1992).

Here, it would have been "natural" – to say the least – for Ms. Wheeler to have included in her respective e-mails to those at the Bank who were working with her on the loan officer commission project the contents of the conversation and the "legal advice" she claims Mr. Karen had given her. It would have also been natural, given the Bank's insistence that Ms. Wheeler had "one goal" after meeting Mr. Karen, namely to hire him if he was available (Reply Brief at 5), to have expressed her intention. After all, Ms. Wheeler and the Bank "w[ere] under intense time pressure to get the Bank's mortgage loan officer compensation in line before the Dodd-Frank regulations came into effect in April 2011." (R. 234-36; Reply Brief at 3).

Here is the kind of email one would have expected Ms. Wheeler to have written if her story were true: Dear Julie, Marc, Jim and Dale,

> I went to an IMBA seminar yesterday where a lawyer named Ari Karen spoke on loan officer compensation regulations. Here's the Powerpoint presentation I asked him to send me. I spent about 15 minutes alone with him before the presentation, and I explained, confidentially of course, the bank's situation. He was very cooperative and gave me legal advice, which I take seriously. I'd like to hire him and I'm going to contact him to find out his rates and availability. I'll send you by separate email a synopsis of our conversation and some info about Ari, then I'd like to have your thoughts.

As previously discussed, Ms. Wheeler's "goal" and "intention" was to hire Mr. Karen if he was available. Ms. Wheeler, I concluded, was an extremely efficient person. (R. 243). Yet, she claimed that it took her a month before she ever tried to contact Mr. Karen again. (R. 191). Ms. Wheeler claimed that she called Mr. Karen and left a voicemail in which she reintroduced herself and said she "wanted to discuss further the... loan officer compensation regulations." (R. 191). Significantly, she did not say that she wanted to discuss hiring him. She claimed that she left a voicemail, but Mr. Karen didn't call back, and so she wrote him off: "I felt that if he didn't call he wasn't looking for my business so I moved on." (R. 220).

18

In any event, if Ms. Wheeler had provided Mr. Karen with confidential information and had he given her legal advice as she claimed and if she called to further discuss the loan officer compensation regulations, it simply defies belief that Mr. Karen would not have been chomping at the bit to call her back

Ms. Wheeler's delay from September 28th until approximately late October to allegedly call Mr. Karen and her excuse for not recontacting him at least with an email has a hollow ring. It is inconsistent with her claim that she communicated confidential information to him, that he gave her legal advice, and that her goal was to hire him to deal with pressing issues confronting the Bank – issues that were extremely time sensitive, requiring completion of the project by the end of the year. (R. 234-35).[14]

For the reasons discussed above, I do not credit Ms. Wheeler's testimony.  Indeed, I find it utterly implausible and contrary to human experience and common sense, which always have a role to play in judging.  *See infra* at 21.

### III.

### ANALYSIS

Considering whether to disqualify an attorney presents a difficult balancing act.  On the one hand, there is prerogative of a party to proceed with counsel of its choice, *Owen v. Wangerin*, 985 F.2d 312, 317 (7th Cir. 1993);  *Schiessle v. Stephens,* 717 F.2d 417, 419-20 (7th Cir.1983), while on the other, there is the court's duty "to safeguard the sacrosanct privacy of the attorney-client relationship."  *Cromley v. Board of Educ. of Lockport Tp. High School Dist. 205*, 17 F.3d 1059,

---

[14] Mr. Karen did not recall having received a voicemail from Ms. Wheeler, but he couldn't say it was impossible.  (R. 87-88).   By the time he agreed to represent loan officers suing American Bank, it was over a year later, and he made no attempt to figure out whom he had spoken with at the presentation.  (R. 96-97).

1066 (7th Cir. 1994). Beyond these considerations, there is the maintenance of the public trust in the propriety of legal proceedings; there are instances where an attorney may be disqualified for the appearance of impropriety. *Cromley*, 17 F.3d at 1066.

The fiduciary relationship existing between lawyer and client extends to preliminary consultation by a prospective client with a view to retention of the lawyer, although actual employment does not result. *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir. 1978). This "hinges upon the client's belief that [s]he is consulting a lawyer *in that capacity* and h[er] *manifested intention* to seek professional legal advice." *Id.* at 1319-1320 (emphasis supplied). *Bank's Reply* at 2. Of course, .that belief must be reasonable. *Bridge Products, Inc. v. Quantum Chemical Corp.*, 1990 WL 70857, 3 (N.D.Ill. 1990).

The Bank submits that the balances weigh in favor of disqualification because Ms. Wheeler shared confidential information with Mr. Karen in the course of establishing a prospective attorney-client relationship with him on behalf of the Bank. Since I do not credit the factual predicate on which the argument rests, that argument must be rejected. Ms. Wheeler's story strains common experience, common sense and credulity. A judge need not leave experience and common sense at the courthouse door. *See District of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 135 n.3 (1992); *United States v. Blagojevich*, 614 F.3d 287, 290 (7th Cir. 2010). "Neither juries nor judges are required to divorce themselves of common sense, but rather should apply to facts which they find proven such reasonable inferences as are justified in light of their experience as to the natural inclinations of human beings." *United States v. Starks*, 309 F.3d 1017, 1023 (7th Cir. 2002).[15]

---

[15] *See also Hobgood v. Illinois Gaming Bd.*, _ F.3d _, 2013 WL 5637701, 9 (7th Cir.2013) (court need not "abandon good reason and common sense" in assessing proffered legitimate excuse).

Common sense and human experience dictate that the brief meeting between Ms. Wheeler and Mr. Karen in an atrium frequented by seminar attendees was not what the Bank now seeks to make it out to have been. We are asked to believe that a bank officer, with more than 40 years of experience, who was responsible for compensation plans and engaging attorneys would wander into a public area, sit herself down some distance away from a man she had never met, and about whom she knew nothing and proceed to divulge confidential Bank information to obtain legal advice, knowing that there were competitors of the Bank who could be passing by at any moment.

Apart from the fact that she testified that she wouldn't have done that (R. 217), only studied avoidance of the facts and Ms. Wheeler's demeanor as she told her yarn could permit a court to accept the Bank's position that when Ms. Wheeler spoke to Mr. Karen she reasonably believed she was "consulting a lawyer *in that capacity,"* and that she "*manifested [an] intention* to seek professional legal advice" from him. The evidence does not show that Ms. Wheeler had a "reasonable belief that the lawyer was acting as the party's attorney.'" *Bridge Products, Inc. v. Quantum Chemical Corp.,* 1990 WL 70857, 3 (N.D.Ill. 1990); *see also Westinghouse,* 580 F.2d at 1319-12; *Pain Prevention Lab, Inc. v. Electronic Waveform Labs, Inc.,* 657 F.Supp. 1486, 1495 (N.D.Ill. 1987).

Nor would someone of Ms. Wheeler's experience, given the exigent circumstances she claimed she was operating under, decide she was going to hire a lawyer and not tell that lawyer at some point he was being considered for retention and ask about his fee structure and availability to take on the assignment . But even more revealing of the falsity of Ms. Karen's story is the fact that she never told anyone at the Bank about Mr. Karen, that it was her goal to hire him, and that he was her first choice to deal with the Bank's exigent loan officer compensation problem. Nor did she tell

21

anyone about the legal advice he supposedly gave in the atrium even though she apparently found it persuasive and was "taking it seriously." And then after waiting a month before making any attempt to contact the lawyer who had given her such significant legal advice, she precipitously blew him off because, she claims, he did not respond to her voicemail. Yet that is exactly what occurred.

Properly viewed, the evidence reveals an encounter of short duration between Mr. Karen and Ms. Wheeler in a public place before a seminar given by Mr. Karen. Ms. Wheeler was not there to get legal advice from a lawyer acting in that capacity; she was there to "pick the brain"of the speaker and get whatever opinion – not his legal advice – on the "several scenarios" that "people were throwing out of what would pass the regulation guidelines and does this mean the requirements or would it be kicked back." (R. 168).

That much of the evidence in this case is circumstantial is of no moment. Circumstantial evidence is every bit as probative as direct evidence and in some cases may be more certain, satisfying and persuasive than direct evidence. *Michalic v. Cleveland Tankers, Inc.,* 364 U.S. 325, 330 (1960). And, of course, the finder of fact can use common sense and human experience to evaluate what inferences may reasonably be drawn from a given set of facts, *see e.g., United States v. Montoya De Hernandez,* 473 U.S. 531, 542 (1985); *University of Pennsylvania v.* E.E.O.C., 493 U.S. 182, 194 (1990); *Cooney v. Rossiter,* 583 F.3d 967, 971 (7th Cir.2009), and "to evaluate what reasonably may be inferred from circumstantial evidence." *United States v. Rose,* 12 F.3d 1414, 1421 (7th Cir.1994). The only question is whether the evidence, be it circumstantial or direct, has sufficient probative force to warrant the inference sought to be drawn.

## IV.

## WAIVER

The plaintiff also contends that the Bank has waived any argument it otherwise might have had regarding Mr. Karen's continued participation in the case. Given the rejection of Ms. Wheeler's version of events, it is unnecessary to reach this issue.

## CONCLUSION

The defendants' motion to disqualify counsel [#141] is DENIED.

**ENTERED:** _____
             **UNITED STATES MAGISTRATE JUDGE**

**DATE:** 11/5/13