# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| **MARC KRAMER, KIRIL TRAJCEVSKI, and MATT NYMAN, on behalf of themselves and others similarly situated,** | ) ) ) ) |  |
| **Plaintiffs,** | ) ) ) |  |
| **v.** | ) ) | **11 C 8758** |
| **AMERICAN BANK AND TRUST COMPANY, N.A., SHARON WHEELER, JULIE KLAUS, HARRY S. COIN, and DALE DOLLENBACHER,** | ) ) ) ) ) | **Judge John Z. Lee** |
| **Defendants.** | ) |  |

## MEMORANDUM OPINION AND ORDER

Plaintiffs are loan officers who have sued American Bank and Trust Co., N.A., and several of its managing officers, Sharon Wheeler, Julie Klaus, Harry S. Coin, and Dale Dollenbacher. According to Plaintiffs, Defendants have failed to pay them the legally mandated minimum wage and appropriate overtime wages, as well as commissions owed under their employment contracts. Plaintiffs have brought suit for violations of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*, the Illinois Minimum Wage Law (IMWL), 820 Ill. Comp. Stat. 105/1 *et seq.*, and the Illinois Wage Payment and Collection Act (IWPCA), 820 Ill. Comp. Stat. 115/1 *et seq.*, as well as for common law breach of contract, fraud by misrepresentation, and fraud by omission. Before the Court are Plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure ("Rule") 23(b)(3) as to the state law claims and Defendants' motion to decertify the FLSA collective action. For the reasons provided herein, the Court grants Plaintiffs' motion and denies Defendants' motion.

# Background

American Bank and Trust Co., N.A. ("the Bank"), is a national bank with its principal place of business in Davenport, Iowa. Defendant Harry Coin was the Bank's President and Chief Executive Officer until February 2009. Defendant Sharon Wheeler was the Bank's Executive Vice President from October 2010 through October 2012. Defendant Dale Dollenbacher was the Bank's Executive Vice President and Corporate Financial Officer from July 2003 to March 2012. Defendant Julie Klaus was the Bank's Senior Vice President of Human Resources from November 2009 until May 2012.

Plaintiffs were employed by the Bank as loan officers and were tasked with obtaining mortgage loans for the Bank's customers. Pls.' Ex. 8, Pls.' Employment Contracts (showing that individual plaintiffs were expected to perform substantially the same tasks). Loan officers worked either from home or in office spaces provided by the Bank. Pls.' Ex. 2, Allen Dep. at 25–26; Pls.' Ex. 6, Wheeler Dep. at 110. As of 2009, the Bank employed forty-seven loan officers in Illinois and eleven loan officers in Iowa. *See* Pls.' Reply Ex. 2, Monthly Commission Summaries, January–December 2009.

Prior to January 2011, the Bank classified loan officers as "sales employees." Pls.' Ex. 7, 3/23/15 Dollenbacher Dep. at 98. Based on this classification, the Bank did not pay loan officers a minimum wage or overtime wages and, instead, paid them only on a commission basis. Pls.' Ex. 2, Allen Dep. at 24–25; Pls.' Ex. 3, 2/7/12 Dollenbacher Dep. at 243–45; Pls.' Ex. 5, Klaus Dep. at 76. According to James Allen, a former bank President, the Bank did not track hours or overtime worked by its loan officers before 2011. Pls.' Ex. 2, Allen Dep. at 32. Beginning in January 2011, however, the Bank began tracking hours worked and started paying loan officers hourly wages as well as overtime wages. Pls.' Ex. 7, 3/23/15 Dollenbacher Dep. at 97. But even

then the Bank, through Defendants Wheeler and Klaus and others, directed loan officers to report only forty hours per week, regardless of whether loan officers worked additional hours. Pls.' Mem. Law Opp'n Defs.' Mot. Decertify Collective Action 8–10 (citing testimony of eleven Plaintiffs). Plaintiffs allege that the Bank's failure to pay them a minimum wage and overtime wages prior to January 2011 and failure to pay them overtime during January 2011[1] were violations of the FLSA and IMWL.

Plaintiffs also assert that Defendants violated state law when they perpetrated a "skimming scheme" in which Defendants artificially deflated loan officers' commissions in contravention of their employment contracts. Defendants had represented to all loan officers that they would be paid monthly commissions as a percent of "revenue generated" from the loans that the loan officers had originated. *See* Pls.' Ex. 18, Employment Agreements. But according to Theresa Mann, the Bank's former Manager of Secondary Marketing, the Bank had a company-wide policy of setting aside for itself a percentage of the revenue that was generated when a mortgage loan was sold in the secondary mortgage market (what the parties call "secondary gain"). *See* Pls.' Ex. 10, Mann Dep. at 33, 71–72; *see also* Pls.' Ex. 9, Kaye Dep. at 54, 58.. The Bank considered secondary gain to be the Bank's profit margin. *See* Pls.' Ex. 9, Kaye Dep. at 54, 58. Thus, a loan officer's commissions were, in fact, a percentage of the total revenue generated from his or her mortgage loans less the secondary gain. *See id.* According to Plaintiffs, this practice violated the IWPCA, breached their employment contracts, and constituted fraud.

---

[1]    The class period for each proposed class ends on January 31, 2011. *See infra*, at 4.

<u>**Analysis**</u>

As an initial matter, a brief overview of the elements of Plaintiffs' causes of action is necessary. Plaintiffs' IMWL claims require them to prove that Defendants failed to pay them the applicable minimum hourly wage or overtime pay for work in excess of forty hours per week. *See* 820 Ill. Comp. Stat. 105/4. To prevail on their IWPCA claims, Plaintiffs must establish that Defendants failed to timely and completely pay their earned wages, defined here as any compensation owed to an employee pursuant to an employment contract or agreement. *See* 820 Ill. Comp. Stat. 115/2.

To prove a breach of contract claim under Iowa law, which governs the contracts at issue, the claimant must establish: "(1) the existence of a contract, (2) the terms and conditions of the contract, (3) that [the claimant] has performed all of the terms and conditions required under the contract, (4) the [opposing party's] breach of the contract in some particular way, and (5) that [the claimant has suffered damages as a result of [the opposing party's] breach." *See Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010); *see also* Pls.' Ex. 8, Pls.' Employment Contracts (stating that Iowa law governs).

Plaintiffs also claim that Defendants committed fraud by representing to them in their employment agreements that they would receive a certain percentage of the total revenue generated from the loans that they originate, when in fact this was not the case. Plaintiffs assert two types of fraud claims. To establish a fraudulent misrepresentation claim, Plaintiffs must show: "(1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance." *Thompson v. Am. Airlines Grp., Inc.*, 128 F. Supp. 3d 1047, 1050 (N.D. Ill. 2015)

(Illinois law).[2]  The elements of fraud by omission are: "(1) concealment of a material fact, (2) with the intent to deceive, and (3) that the plaintiff was unaware of the concealed fact and would have acted differently had the plaintiff known of it." *Bors v. Duberstein*, No. 03 C 4636, 2004 WL 1588271, at *4 (N.D. Ill. July 15, 2004) (Illinois law).

Plaintiffs have also asserted a claim under the FLSA.  "[E]mployees who institute a collective action against their employer under the terms of the [FLSA] may at the same time litigate supplemental state-law claims as a class action certified according to Federal Rule of Civil Procedure 23(b)(3)." *Ervin v. OS Rest. Servs.*, 632 F.3d 971, 973–74 (7th Cir. 2011). "Collective actions under the FLSA are different than class actions authorized by Federal Rule of Civil Procedure 23, because in FLSA cases the plaintiff is given notice and an opportunity to *opt in,* rather than notice and an opportunity to *opt out.*" *Jirak v. Abbott Labs., Inc.*, 566 F. Supp. 2d 845, 847 (N.D. Ill. 2008) (emphasis in original).  This distinction aside, the Seventh Circuit has recognized the similarity between class actions certified under Rule 23 and FLSA collective actions certified under 29 U.S.C. § 216(b) ("Section 216(b)").  *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013); *Smith v. Family Video Movie Club, Inc.*, No. 11 C 1773, 2015 WL 1542649, at *3 (N.D. Ill. Mar. 31, 2015).  Here, the Court will evaluate the appropriateness of class certification under Rule 23 and then turn to Section 216(b).

I.      **Class Certification Under Rule 23**

Plaintiffs seek to certify two classes under Rule 23(b)(3).  The first is an IMWL class alleging failure to pay minimum wage and overtime.  It is defined as:  "All loan officers employed by American Bank & Trust Company ('AB&T') in Illinois at any point in time from December 9, 2008, through January 2011."  The second class is based on the alleged skimming

---

[2]      Because neither side has presented a conflict between the applicable substantive tort law of Illinois and Iowa, the Court applies the laws of the forum state. *See Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 397 n.1 (7th Cir. 2009).

scheme and is divided into two subclasses. Subclass I asserts IWPCA violations and is defined as: "All loan officers employed by AB&T in Illinois at any point in time from December 9, 2001, through January 2011." Subclass II asserts breach of contract and fraud claims and is defined as: "All loan officers employed by AB&T at any point in time from December 9, 2006, through January 2011."[3]

"The class action [under Rule 23] is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal–Mart Stores Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal citations and quotation marks omitted). In order to justify a departure from that rule, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* (internal quotation marks omitted). "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Id.*

To be certified under Rule 23, a proposed class must satisfy each of Rule 23(a)'s four requirements: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

If Rule 23(a) is satisfied, the proposed class must fall within one of the three categories in Rule 23(b), which the Seventh Circuit has described as: "(1) a mandatory class action (either because of the risk of incompatible standards for the party opposing the class or because the risk

---

[3]      It is not at all clear why Plaintiffs have categorized the breach of contract class and fraud class as subclasses under the IWPCA, when they have asserted a separate IWPCA class (which they call Subclass I). Because Plaintiffs have asserted separate claims for breach of contract and fraud, it seems more appropriate to construe the breach of contract "subclass" and fraud "subclass" as two separate classes, independent from the IWPCA "subclass," and the Court will do so. *See Streeter v. Sheriff of Cook Cty.*, 256 F.R.D. 609, 611 (N.D. Ill. 2009) (stating that a district court has broad discretion to modify a class).

that the class action adjudication would, as a practical matter, either dispose of the claims of nonparties or substantially impair their interests), (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common questions predominate and class treatment is superior." *Spano v. The Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011).

"Rule 23 does not set forth a mere pleading standard." *Dukes*, 564 U.S. at 350. "On issues affecting class certification . . . a court may not simply assume the truth of the matters as asserted by the plaintiff." *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012). Rather, the named plaintiff bears the burden of showing that a proposed class satisfies each requirement of Rule 23 by a preponderance of the evidence. *Id.* "Failure to meet any one of the requirements of Rule 23 precludes certification of a class." *Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993). Certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Dukes*, 564 U.S. at 350–51. The Seventh Circuit has directed district courts to exercise "caution in class certification generally." *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 746 (7th Cir. 2008). That said, the Court should not "turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner*, 669 F.3d at 811.

## A.  Rule 23(a)'s Requirements

### 1.  Rule 23(a)(1): Numerosity

Rule 23(a)(1) is satisfied where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[C]ommon sense assumptions can be made in order to support a finding of numerosity." *Barragan v. Evanger's Dog & Cat Food Co., Inc.*, 259 F.R.D. 330, 333 (N.D. Ill. 2009). A class with as few as forty members has been held to satisfy the numerosity requirement. *See Swanson v. Am. Consumer Indus., Inc.*, 415 F.2d 1326, 1333 n.9

(7th Cir. 1969); *see also Pruitt v. City of Chi.*, 472 F.3d 925, 926–27 (7th Cir. 2006) ("Sometimes even 40 plaintiffs would be unmanageable.").

Plaintiffs have submitted evidence that, in 2009 alone, the Bank employed forty-seven loan officers in Illinois. *See* Pls.' Reply Ex. 2, Monthly Commission Summaries, January–December 2009. This is sufficient to establish numerosity for both the IMWL and IWPCA classes. For the breach of contract and fraud classes, the number of loan officers increases because those classes also include the Bank's loan officers located in Iowa as well as Illinois. *See id.* (listing an additional eleven loan officers in Iowa in 2009).

For their part, Defendants assert that there will be an insufficient number of class members who have claims against all five Defendants because the individual Defendants worked for the Bank at different times. *See* Defs.' Decert. Mot., Ex. LL, Chart (listing one plaintiff who did not work with Defendants Dollenbacher or Klaus, five plaintiffs who did not work with Defendant Wheeler, and eighteen plaintiffs who did not work with Defendant Coin). But given the sheer number of loan officers working at the Bank during the relevant class periods, Defendants' isolated examples are insufficient to destroy numerosity.[4] Accordingly, the Court finds that numerosity is satisfied.

### 2. Rule 23(a)(2): Commonality

The second Rule 23 element, commonality, requires a plaintiff to demonstrate that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" and not "merely that they have all suffered a violation of the same provision of law." *Dukes*, 564

---

[4] Defendants also argue that the Plaintiffs' varied understanding of what "revenue generated" means destroys numerosity. Because this argument seems to attack commonality, rather than numerosity, the Court addresses the argument below.

U.S. at 349–50 (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 157 (1982)). "The class 'claims must depend upon a common contention,' and '[t]hat common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497 (7th Cir. 2012) (quoting *Dukes*, 564 U.S. at 350).

With regard to the IMWL claim, the class members have clearly suffered the alleged same injury because Defendants classified every loan officer as employees who are exempt from minimum wage and overtime laws. Pls.' Ex. 2, Allen Dep. at 24–25; Pls.' Ex. 3, 2/7/12 Dollenbacher Dep. at 243–45; Pls.' Ex. 5, Klaus Dep. at 76. A question of law common to the IMWL class claims is thus whether Defendants' classification was proper. That determination will be based on common proof regarding the nature of the work loan officers performed for the Bank. Defendants' arguments that each class member will have different damages does not defeat commonality. *See De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 233 (7th Cir. 1983) ("It is very common for Rule 23(b)(3) class actions to involve differing damage awards for different class members.").

Another common question of law is whether the individual Defendants are "employers" under the IMWL. *See Cho v. Maru Rest., Inc.*, 194 F. Supp. 3d 700, 704–705 (N.D. Ill. 2016); *Zampos v. W&E Commc'ns, Inc.*, 970 F. Supp. 2d 794, 806 (N.D. Ill. 2013). Other common questions of fact involve the nature of the work that loan officers performed and whether putative class members were universally told to omit overtime from their timesheets after Defendants started to track their hours.

Common questions also abound with regard to Plaintiffs' IWPCA and skimming claims, including: (1) whether individual Defendants are "employers" under the IWPCA, (2) whether Defendants represented to loan officers as part of their employment agreements that their commissions would be a percentage of revenue generated[5], (3) whether the portion withheld from commissions known as "secondary gain" included revenue generated from loans, and (4) whether any Defendant failed to pay commissions owed to Plaintiffs. These common questions, to which there will be common answers, are sufficient to satisfy the commonality requirement.

For their part, Defendants argue that there will be certain individual questions, including the amount of damages each individual class member suffered and how each class member interpreted certain provisions in their contracts. But Rule 23(a)(2) does not require commonality of all questions. *See Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 379 (7th Cir. 2015). Moreover, "the need for individual damages determinations does not, in and of itself, require denial of [a] motion for certification." *Arreola v. Godinez*, 546 F.3d 788, 801 (7th Cir. 2008). In addition, "claims arising from interpretations of a form contract appear to present the classic case for treatment as a class action . . . ." *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998); *see* Pls.' Ex. 8, Pls.' Employment Contracts ¶ 3a. Lastly, where, as here, the purported fraud is based on alleged conduct that was uniform as to all class members, "it is well established that individual issues of reliance do not thwart class actions of common law fraud claims." *Sparano v. Southland Corp.*, No. 94 C 2098, 1996 WL 681273, at *3 (N.D. Ill. Nov. 21, 1996) (certifying common law fraud class of franchise owners); *see Arenson v. Whitehall Convalescent and Nursing Home. Inc.*, 164 F.R.D. 659, 666 (N.D. Ill.1996) (certifying class despite individualized

---

[5]    Although Defendants provide 2005 and 2007 employment agreements omitting the term "revenue generated" for Janet Norris, who is not a class representative, *see* Defs.' Decert. Mot., Ex. T, Norris 2005 Employment Contract at 1, Defs.' Resp. Opp'n Class Cert., Ex. U, Norris Dep. Ex. 7, Norris 2007 Employment Contract at 2, it is unclear whether Norris received the same form contract as other loan officers in other years.

issues of reliance in common law fraud claims); *Alexander v. Centrafarm Group, N.V.*, 124 F.R.D. 178, 186 (N.D. Ill. 1988) (same). Proceeding on a class-wide basis is also appropriate because, except for a few outliers, most class members do not have a sufficient stake in their fraud claims to go it alone. *See* Def. Bank's Ex. JJ, ECF No. 498 (showing that, with a few exceptions, most Plaintiffs assert fraud damages ranging from $1,000 to $25,000).

Defendants also contend that Plaintiffs are barred from proceeding as a class on their IWPCA claim because the January 1, 2011, IWPCA amendment adding a class action right is a substantive change in the law, which cannot be applied retroactively. In support, Defendants cite *Thomas v. Weatherguard Construction Co., Inc.*, 42 N.E.3d 21, 39–40 (Ill. App. Ct. 2015). But this is incorrect. The ability to bring a class action is a procedural, not a substantive, right, *see Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393, 408–09 (2010), and numerous courts had certified IWPCA class actions even before the enactment of the 2011 IWPCA amendments, *see Kernats v. Comcast Corp.*, Nos. 09 C 3368, 09 C 4305, 2010 WL 4193219, at *9 (N.D. Ill. Oct. 20, 2010).[6] Thus, Plaintiffs have established commonality.

### 3. Rule 23(a)(3): Typicality

"The question of typicality in Rule 23(a)(3) is closely related to the preceding question of commonality." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente*, 713 F.2d at 232. Although "[t]he typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members," the requirement "primarily directs the district court to focus on whether the named

---

[6] Defendants, however, correctly assert that the Court may not retroactively apply the January 1, 2011 IWPCA amendment authorizing recovery of 2% monthly interest on unpaid wages, any calculation of damages regarding such interest can easily be limited to post–January 1, 2011 unpaid wages.

representatives' claims have the same essential characteristics as the claims of the class at large." *Id.*

Defendants first argue that the claims of named plaintiffs Matt Nyman and Kiril Trajcevski are not typical of the class, because they were not employed by the Bank as loan officers during the entirety of any class period. This argument misses the point. Where a class representative's claims arise from the same course of conduct and the same legal theory that is alleged by the class throughout the class period, typicality is satisfied. *See id.* Because Nyman's and Trajcevski's claims arise from the same course of conduct, *i.e.*, Defendants' categorical treatment of loan officers as exempt employees and alleged commission-skimming scheme, their claims are typical of the class, and they have sufficient incentive to fully develop the facts.

Defendants also argue that Nyman's and Trajcevski's claims are not typical, because their deposition testimony reveals their lack of basic information about the case, rendering their claims weaker than most. For example, according to Defendants, neither Nyman nor Trajcevski knew precisely what evidence has been gathered to support the class's theory that the individual Defendants should be deemed "employers" under the IMWL or the IWPCA. Defs.' Resp. Opp'n Class Cert. at 4–5. In addition, neither understood the legal theory or evidence on which their fraud claims are based. *Id.* However, as the Supreme Court has explained, a named plaintiff's lack of understanding of the issues in a case is insufficient to prevent certification. *See Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 365–66 (1966); *see also Eggleston v. Chi. Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 896 (7th Cir. 1981). It is enough that the class representatives' claims are based on the same legal theories as those of other class members. *See Surowitz*, 383 U.S. at 365–66; *Eggleston*, 657 F.2d at 896.

In addition, Defendants contend that by offering conflicting calculations of his damages, Nyman's claims are atypical and subject to defenses inapplicable to other class members. But, as stated above, questions about individual damages pose little barrier to class certification. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671 (7th Cir. 2015) ("It has long been recognized that the need for individual damages determinations at [a] later stage of the litigation does not itself justify the denial of certification."). Accordingly, the typicality requirement is satisfied.

### 4. Rule 23(a)(4): Adequacy of Representation

"The final subdivision of Rule 23 requires that the representative parties fairly and adequately represent the class." *Rosario*, 963 F.2d at 1018. "This adequate representation inquiry consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). "[T]he judge [must] . . . assess the class lawyer's competence before certifying a suit to proceed as a class action." *Greisz v. Household Bank (Ill.), N.A.*, 176 F.3d 1012, 1013 (7th Cir. 1999).

As an initial matter, Defendants challenge the adequacy of Nyman and Trajcevski's representation on the same grounds that they challenge typicality, and for the same reasons discussed above, the Court rejects them here.

In addition, Defendants argue that class counsel cannot adequately represent the putative class, because counsel has not diligently prosecuted the class claims. It is true that this case has been pending for many years. There has been a great deal of motion practice at every turn, including meritorious motions to compel discovery filed by both sides. The fact that this case has become long in the tooth is less a reflection of the inadequacy of class counsel, and more an

indication of fierce, scorched-earth litigation techniques by both sets of counsel. The Court does not find class counsel inadequate on this ground.[7]

Next, Defendants argue that class counsel is inadequate, because Defendants intend to call Ari Karen, one of Plaintiffs' attorneys, as a fact witness to testify about certain legal advice pertaining to employment law that he purportedly gave to Defendant Wheeler at a seminar in 2010. The facts surrounding this seminar were fully explored before Magistrate Judge Cole, who found, after considering the evidence, that Karen, in fact, had not provided legal advice to Wheeler and had not acted as Wheeler's counsel at the time. *See Kramer v. Am. Bank & Trust Co., N.A.*, 989 F. Supp. 2d 709, 721–22 (N.D. Ill. 2013) (denying motion to disqualify Karen and finding Wheeler's testimony that she, on the Bank's behalf, sought and obtained legal advice from Karen "strains common experience, common sense and credulity"). Defendants did not object to Judge Cole's ruling and are bound by that determination.

Defendants also state that they intend to call as a trial witness Darren Weiss, who is an associate at class counsel's law firm. Weiss, it appears, created a spreadsheet to provide to Defendants as part of Plaintiffs' disclosures of damages under Rule 26(a)(1)(A)(iii). But Plaintiffs will presumably offer an expert witness to testify about the damages incurred by the class at trial. And, at any rate, the mere fact that Weiss prepared a damages chart as part of Plaintiffs' initial disclosures does not demonstrate inadequacy of counsel.

## B.      Rule 23(b)(3)'s Requirements

Once the requirements of Rule 23(a) are satisfied, certification of a class under Rule 23(b)(3) is proper if "the questions of law or fact common to class members predominate over

---

[7]      Defendants also assert that class counsel has inadequately represented Plaintiffs in the instant FLSA collective action by not filing the named Plaintiffs' consent-to-join forms until six months after the litigation commenced, rather than attaching them as exhibits to the complaint when originally filed. Defendants do not provide, and the Court has not found, a single case in which a court has held that such conduct supports a finding of inadequacy of counsel.

any questions affecting only individual members, and [when] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Defendants limit their discussion to the issue of predominance, and so shall the Court.

"Predominance of issues common to all class members, like the other requirements for certification of a suit as a class action, goes to the efficiency of a class action as an alternative to individual suits." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014). Thus, the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "Rule 23(b)(3)'s predominance requirement is satisfied when 'common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single adjudication.'" *Messner*, 669 F.3d at 815 (quoting 7AA Wright & Miller, Federal Practice & Procedure § 1778 (3d ed. 2011)). "Analysis of predominance under Rule 23(b)(3) 'begins . . . with the elements of the underlying cause of action.'" *Id.* (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)).

With regard to the IMWL claims, Defendants primarily argue that individual damages issues will predominate over common questions, relying on the Supreme Court's holding in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). In *Comcast*, an antitrust case, the Supreme Court concluded that "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.* However, the concern in *Comcast* was not that class members would need to provide individualized proof of their damages; the concern was that no calculation method had been identified that would measure only those damages attributable to the alleged antitrust violation. *Id.* In other words, the proposed calculation

method in *Comcast* would not have measured *any* class member's "damages resulting from the particular antitrust injury." *Id.*

In this case, unlike in *Comcast*, Plaintiffs propose a class-wide method of calculating damages, based on the hours that an individual class member worked, that would measure only those damages attributable to the claimed violations of federal and state minimum wage and overtime laws. In response, Defendants contend that it still will be impossible to determine damages using a class-wide methodology, because the class members did not work the same schedule, hours, or days. But if this were a requirement for finding predominance, no FLSA collective action or IMWL class would ever be certified, for it would be a rare case indeed in which each class member worked identical hours each day or week. *See, e.g.*, *Alvarez v. Chi.*, 605 F.3d 445, 449 n.1 (7th Cir. 2010) ("[R]ecovery will be determined by the application of mathematical formulae common to all class members, although the specific variables (number of hours worked, hourly wage, etc.) will vary from individual to individual. . . . [I]f necessary, Fed. R. Civ. P. 53(a)(1)(B)(ii) authorizes the district court to appoint a special master to 'resolve a difficult computation of damages.'"). What is more, even after *Comcast*, the Seventh Circuit has reiterated that the need to calculate damages on an individual basis alone will not preclude class certification under Rule 23(b)(3). *See Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 801 (7th Cir. 2013) ("If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification.").

Defendants further contend that Plaintiffs have no way to establish that they worked in excess of forty hours per week on a class-wide basis and have no viable plan to permit them to

do so. Plaintiffs respond that Defendants cannot use their own failure to maintain time records as a shield against certification. The Supreme Court addressed this issue in *Tyson Foods, Inc. v. Bouraphakeo*, 136 S. Ct. 1036, 1047 (2016). As here, the plaintiffs in *Tyson* sought certification of state-law wage-payment claims under Rule 23. The Supreme Court explained: "when employers violate their statutory duty to keep proper records, and employees thereby have no way to establish the time spent doing uncompensated work, the 'remedial nature of [the FLSA] and the great public policy which it embodies . . . militate against making' the burden of proving uncompensated work 'an impossible hurdle for the employee.'" *Id.* at 1047 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). Then, applying *Mt. Clemens* in the context of Rule 23(b)(3), the *Tyson* Court stated:

> Instead of punishing "the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work," the Court held "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." 328 U.S., at 687, 66 S.Ct. 1187. Under these circumstances, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.*, at 687–688, 66 S.Ct. 1187.

*Id.*

Here, Plaintiffs have produced sufficient evidence to create a reasonable inference that they all worked in excess of forty hours per week such that common issues predominate. They have presented the testimony of loan officers from various Bank locations, who state that loan officers regularly put in overtime each week. *See, e.g.*, Pls.' Decert. Ex. 8, J. Sanchez Dep. at 63–65 (Chicago); Pls.' Decert. Ex. 9, Sommese Dep. at 114 (Chicago); Pls.' Decert. Ex. 4, Norris Dep. at 58–59, 65, 67, 71 (Coralville); Pls.' Cert. Ex. 10, Nyman Dep. at 86, 95 (Elburn);

Pls.' Decert. Ex. 14, Benhart Dep. at 145–46 (Elburn); Pls.' Decert. Ex. 20, Gerrity Dep. at 37–38 (Geneva); Pls.' Decert. Ex. 21, Hanson Dep. at 80–82 (Lisle); Pls.' Decert. Ex. 22, Houdek Dep. at 38–40 (Lisle); Pls.' Decert. Ex. 3, Marguerite Dep. at 120, 128–29 (Oakbrook); Pls.' Cert. Ex. 11, Trajcevski Dep. at 49 (Oakbrook).  In addition, Plaintiffs rely on an admission by Jeff Gennarelli, the Bank's Regional Vice President, on May 7, 2010, that in order for the Bank to avoid overtime lawsuits, it should institute a policy of paying its loan officers $425.00 per week in salary.  Pls.' Ex. 11, at 1.  Given that the Illinois minimum wage was $8.00 per hour at the time,[8] Gennarelli's proposed company-wide salary for loan officers is based on the factual proposition that loan officers, as a category, worked approximately 8.75 hours in overtime each week.

By contrast,  the Bank has not pointed to any evidence to rebut the reasonableness of the inference that Plaintiffs have created.  For example, the Bank could have presented certain loan officers who did not regularly put in overtime.  *See Kohen v. Pacific Inv. Mgmt. Co. LLC*, 571 F.3d 672, (7th Cir. 2009) (stating that defendant could have deposed a sample of the putative class).  Or the Bank could have attempted to discredit the testimony of any of the loan officers regarding his or her estimated overtime hours.  The Bank did not do so.

Defendants also argue that individual issues predominate as to the IMWL claim because the trier of fact will have to determine whether each individual loan officer was either salaried or paid on a commission basis.  To the contrary, except for two outliers, Michelle Gorsuch and Janet Norris, it appears that all loan officers were paid strictly on a commission basis prior to 2011.  Pls.' Ex. 2, Allen Dep. at 24–25; Pls.' Ex. 3, 2/7/12 Dollenbacher Dep. at 243–45; Pls.' Ex. 5, Klaus Dep. at 76.  *Compare* Defs.' Decert. Mot., Ex. H, Gorsuch Dep. at 122 (stating that

---

[8]      The Court takes judicial notice of the $8.00 per hour Illinois minimum wage as of May 7, 2010. *See, e.g.*, *Iraheta v. Lam Yuen, LLC*, No. CBD-12-1426, 2013 WL 6713219, at * 9 (D. Md. Dec. 18, 2013) (taking judicial notice of minimum wage under state law).

Gorsuch received a base salary, though it is unclear when), *and* Defs.' Resp. Opp'n Class Cert., Ex. U, Norris Dep. at 52 (stating that Norris received an annual salary with regard to certificates of deposit but received commissions on loans), *with* Pls.' Ex. 8, Pls.' Employment Contracts ¶ 3 (showing that compensation was purely commission-based).  These outliers will, of course, be required to substantiate the amount of their loss in subsequent damages proceedings. Furthermore, a common issue will predominate regarding whether the form employment contracts governing the vast majority of loan officers' compensation guaranteed them a salary. *See* 29 C.F.R. § 541.602(a) (stating that an employee will be considered to paid on a salary basis "if the employee regularly receives each pay period . . . a predetermined amount" that "is not subject to reduction because of variations in the quality or quantity of the work performed").

Turning to Plaintiffs' IWPCA, contract, and fraud claims, Defendants argue that proof of these claims will depend on each loan officer's individual interpretation of what the term "revenue generated" means as it appears in the contracts.  As an initial matter, Defendants have not sought a determination as to whether the term "revenue generated" is ambiguous as a matter of law.  *See generally* Defs.' Resp. Opp'n Class Cert.  Furthermore, even if they had, Defendants could not rely on subjective evidence to create ambiguity.  *See Home Ins. Co. v. Chi. & Nw. Transp. Co.*, 56 F.3d 763, 768 (7th Cir. 1995) ("'Subjective' evidence of ambiguity is 'the testimony of the parties themselves as to what they believe the contract means,' which is invariably self-serving, inherently difficult to verify and thus, inadmissible.").  Defendants also rely on two contradictory jury verdicts in cases involving the same breach of contract claim against American Bank to show that contract interpretation may differ.  *See* Defs.' Ex. F, Gennarelli Verdict (finding American Bank not liable for breach of contract); *id.*, Ex. F, Sommese Verdict (finding American Bank liable for breach of contract and awarding

$997,274.16 in contract damages). There are myriad reasons why certain claimants succeed at trial and others do not. The verdict forms, standing alone, provide scant insight into the reasons behind the different verdicts. Accordingly, such arguments are insufficient to defeat a finding of predominance in light of the other common issues discussed above.

Based on the record, the Court finds that there are a number of common issues that apply to all putative class members and are sufficiently central to the resolution of this action that they predominate. For example, the issue whether the Bank improperly classified its loan officers as exempt from minimum wage and overtime laws will be a significant aspect of this case that will resolve the issue for all class members in one fell swoop. Similarly, another key issue is whether the Bank precluded its loan officers from recording their overtime hours worked in January 2011. Additional issues central to this case include whether Defendants represented to loan officers in their employment agreements that they would be paid commissions based on the revenue generated from their loans, and whether the Bank had a policy of deducting an amount from the revenue generated from the secondary sales of loans prior to calculating loan officer commissions without informing them of this fact. All of these issues apply to the class as a whole and are the driving forces of this litigation.

For these reasons, the Court concludes that the requirements of numerosity, commonality, typicality, adequacy of representation, and predominance have been satisfied. Additionally, for the same reasons, the Court finds that proceeding as a class action is a superior method for fairly and efficiently adjudicating the disputed claims in this case. The Court, exercising its discretion to promote the efficient litigation of this action, hereby certifies the following classes under Rule 23(b)(3):

> (1) The "Illinois Minimum Wage Law Class" is defined as "All loan officers employed by American Bank & Trust Company ('AB&T') in

Illinois at any point in time from December 9, 2008, through January 2011."

(2) The "Illinois Wage Payment and Collection Act Class" is defined as "All loan officers employed by AB&T in Illinois at any point in time from December 9, 2001, through January 2011."

(3) The "Breach of Contract Class" is defined as "All loan officers employed by AB&T at any point in time from December 9, 2006, through January 2011."

(4) The "Fraud Class" is defined as "All loan officers employed by AB&T at any point in time from December 9, 2006, through January 2011."

## II.    Collective Action Under the FLSA

Defendants seek to decertify the FLSA collective action, which the Court conditionally certified for the purpose of notice on March 12, 2014. The collective action is defined as: "All loan officers employed by AB&T's Mortgage Division from June 12, 2009, to the present, who were paid on a commission basis and who were not paid minimum wage or overtime compensation." *See* Notice to FLSA Class, ECF No. 260.

"Under Section 216(b) of the FLSA, employees may bring a collective action on behalf of themselves and other 'similarly situated' employees against employers who violate the Act's minimum wage or overtime provisions." *Smallwood v. Ill. Bell Tel. Co.*, 710 F. Supp. 2d 746, 750 (N.D. Ill. 2010) (quoting 29 U.S.C. § 216(b)). "District courts have considerable discretion in implementing Section 216(b)." *Allen v. City of Chi.*, No. 10 C 3183, 2013 WL 146389, at *2 (N.D. Ill. Jan. 14, 2013). Importantly, "[t]he FLSA does not define the term 'similarly situated,'" *Russell v. Ill. Bell Tel. Co., Inc.*, 721 F. Supp. 2d 804, 811 (N.D. Ill. 2010), and "[n]either the Supreme Court nor the Seventh Circuit has specified a procedure courts must employ to decide certification and notice issues under the FLSA." *Allen*, 2013 WL 146389, at *2. Notwithstanding this lack of explicit direction, "the majority of courts . . . have adopted a

two-step process for determining whether an FLSA lawsuit should proceed as a collective action." *Jirak*, 566 F. Supp. 2d at 847. Courts in this district routinely employ this two-step process to determine whether FLSA claims should proceed as a collective action. *See, e.g.*, *Rottman v. Old Second Bancorp, Inc.*, 735 F. Supp. 2d 988, 990 (N.D. Ill. 2010) ("[C]ourts in this district and around the country have settled on a two-step procedure for dealing with collective actions under the FLSA.") (internal citations omitted).

As part of the first step, a court decides whether to conditionally certify a collective action. In so doing, a court evaluates whether the plaintiff can demonstrate that there are similarly situated employees who may also be claimants. If a plaintiff can show that similarly situated individuals exist, a court will grant conditional approval of the collective action and will allow notice of the case to be sent to the similarly situated employees, who have the opportunity to opt in as plaintiffs. *See Heckler v. DK Funding, LLC*, 502 F. Supp. 2d 777, 779 (N.D. Ill. 2007). The standards for conditional approval are "lenient," *Jirak*, 566 F. Supp. 2d at 848, and require only "'a modest factual showing sufficient to demonstrate that [the named plaintiff] and potential plaintiffs were victims of a common policy or plan that violated the law.'" *Russell*, 575 F. Supp. 2d at 933 (quoting *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1045 (N.D. Ill. 2003)). "Since the 'similarly situated' standard is a liberal one, it 'typically results in conditional certification of a representative class.'" *Rottman*, 735 F. Supp. 2d at 990 (quoting *Cameron–Grant v. Maxim Healthcare Serv., Inc.*, 347 F.3d 1240, 1243 n.2 (11th Cir. 2003)).

As part of the second step, a court reevaluates the appropriateness of certification after members of the collective action have opted in and the parties have conducted discovery. "Once it is known which employees will be part of the class, the Court must reevaluate the conditional certification to determine whether there is sufficient similarity between the named and opt-in

plaintiffs to allow the matter to proceed to trial on a collective basis." *Id.* During this reevaluation, a "[d]efendant may then move to decertify the class or divide the class into subclasses." *Smallwood*, 710 F. Supp. 2d at 753. "The Court must consider: (1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns." *Franks v. MKM Oil, Inc.*, No. 10 C 13, 2012 WL 3903782, at *10 (N.D. Ill. Sept. 7, 2012). "These factors help a court determine whether it can manage the case and bring about a fair and reasonably expeditious resolution of the collective action." *Russell*, 721 F. Supp. 2d at 811.

As noted previously, the analysis to proceed as a collective action under Section 216(b) addresses many of the same issues that are considered when determining whether class certification under Rule 23 is appropriate. In fact, Defendants' arguments to decertify the FLSA collective action mirror their objections to commonality, typicality, and predominance under Rule 23.

For the same reasons that the Court finds that Plaintiffs have satisfied the commonality, typicality, and predominance requirements in Rule 23, the Court find that Plaintiffs have met their burden to show that the opt-in plaintiffs are "similarly situated" under Section 216(b). *See Dekeyser v. Thyssenkrupp Waupaca, Inc.*, 314 F.R.D. 449, 456 (E.D. Wis. 2016) ("[A] minimum logic would seem to dictate that a class satisfying Rule 23(a) and Rule 23(b)(3), including the requirements of commonality, typicality, adequacy of representation, predominance, manageability, etc., also satisfies the FLSA's less onerous 'similarly situated' requirement (even if it is conceivable that the converse may not always be true)."). Defendants, however, have

raised some arguments in support of their motion to decertify the FLSA class that are not included in their opposition to Plaintiffs' motion to certify the state law classes.

First, Defendants contend that Plaintiffs are not similarly situated because some putative class members had different job titles and perform other functions in addition to those of a loan officer. Notably, however, Defendants do not point to any Plaintiff who did not spend most of his or her time generating loan sales, regardless of title. More importantly, Plaintiffs provide scads of examples of loan officers uniformly describing their functions as loan officers. *See* Pls.' Mem. Law Opp'n Defs.' Mot. Decertify Collective Action at 2 nn. 1–8.

Defendants also argue that certain Plaintiffs were not loan officers during their entire tenure with the Bank. But this argument, and others like it, merely suggests that some Plaintiffs may not recover as much in damages as others. It does not mean that Plaintiffs are not similarly situated by being subjected to the Bank's purportedly illegal policies that denied them a minimum wage and overtime pay as loan officers.

Finally, Defendants assert that "highly individualized inquiries are needed to determine the applicability of various affirmative defenses to each member's claim." Defs.' Mem. Supp. Mot. Decertify Collective Action 12. In support, Defendants point to the lack of records to substantiate the hours that Plaintiffs worked. As discussed above, the Supreme Court has lowered the bar for plaintiffs trying to prove uncompensated hours of work where their employer has violated the FLSA's recording requirements. *See Mt. Clemens*, 328 U.S. at 686–88 (holding that FLSA employee has the burden to prove by evidence sufficient to raise a reasonable inference that he performed work for which he was improperly compensated, and employer has the burden of production to negate that the reasonableness of the inference), *superseded on other grounds by Portal-to-Portal Act of 1947*, 29 U.S.C. §§ 251–62. That Defendants are required to

produce evidence to negate a reasonable inference of overtime hours worked by the class does not preclude Plaintiffs from proceeding as a collective action.

In addition, Defendants contend that a few opt-in Plaintiffs' claims are entirely outside the FLSA's statute of limitations. As explained in *Russell v. Illinois Bell Telephone Co., Inc.*, however, where FLSA plaintiffs are subjected to common practices and policies, statute of limitations issues do not preclude proceeding on a collective basis. 721 F. Supp. 2d at 821. Moreover, such issues are easily addressed on summary judgment.

Accordingly, the Court declines to decertify the previously conditionally certified FLSA collective action. The FLSA collective action class remains defined as: "All loan officers employed by AB&T's Mortgage Division from June 12, 2009, to the present, who were paid on a commission basis and who were not paid minimum wage or overtime compensation." *See* Notice to FLSA Class, ECF No. 260.

<u>Conclusion</u>

For the reasons provided herein, the Court grants Plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23(b)(3) regarding the state law claims [435] and denies Defendants' motion to decertify the conditionally certified FLSA collective action [445].

**SO ORDERED**                                          **ENTER:  3/31/17**

_____

**JOHN Z. LEE**
**United States District Judge**