IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARC KRAMER, KIRIL TRAJCEVSKI, and MATT NYMAN, on behalf of themselves and all others similarly situated, | )<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) No. 11-cv-08758<br>) |
| AMERICAN BANK AND TRUST COMPANY, N.A., | ) Judge Andrea R. Wood<br>)<br>)<br>) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs are former loan officers for Defendant American Bank and Trust Co., N.A. ("ABT") who have brought this class action against ABT,[1] alleging that it failed to pay minimum and overtime wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and Illinois Minimum Wage Law ("IMWL"), 820 ILCS §§ 105/4, 1054(a). Plaintiffs also claim breach of contract, fraud, and violation of the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS § 115/4, based on the allegation that ABT failed to calculate their commissions as agreed in their employment agreements. The Court previously granted Plaintiffs' motion to conditionally certify a collective action under the FLSA, after which thirty individuals opted into the FLSA collective action.[2] The Court also granted Plaintiffs' motion for class certification under Federal Rule of Civil Procedure 23.[3] (Dkt. No. 581.) ABT sought

---

[1] Plaintiffs originally sued several individual managing officers as well as ABT. Plaintiffs subsequently voluntarily dismissed their claims against the individual defendants.

[2] The FLSA collective action is defined as: "All loan officers employed by American Bank & Trust's Mortgage Division from June 12, 2009, to the present, who were paid on a commission basis and who were not paid minimum wage or overtime compensation." (Dkt. No. 260.)

[3] The Court certified the following four classes:

1

reconsideration of those decisions, but the decisions were reaffirmed. (Dkt. No. 664.) Now before the Court are the parties' cross-motions for summary judgment. (Dkt. Nos. 583, 608.) For the reasons discussed below, the Court denies both motions.

## BACKGROUND

Except where otherwise noted, the following facts are undisputed.

Plaintiffs are former mortgage loan officers for ABT. Before January 2011, ABT classified loan officers as exempt from minimum wage and overtime requirements under the FLSA. (Def.'s Resp. to Pl.s' Statement of Undisputed Facts ("DRSOF") ¶ 1.) Based on this classification, ABT did not track hours worked by loan officers or pay them overtime wages. (DRSOF ¶¶ 8, 9.) At least some Plaintiffs routinely worked in excess of 40 hours per week. (DRSOF ¶ 10.) ABT's classification of loan officers as exempt from minimum wage and overtime requirements was based on the Department of Labor's ("DOL") guidance at the time that mortgage loan officers were properly classified as exempt employees. (DRSOF ¶¶ 8, 9, 14, 17.) In the summer of 2010, however, the DOL reversed its previous guidance and issued new guidance that mortgage loan officers were not exempt from minimum wage and overtime laws. (DRSOF ¶ 17.) In the months following that announcement, ABT executives began a project to assess

---

(1) The "Illinois Minimum Wage Law Class" is defined as "All loan officers employed by American Bank & Trust Company in Illinois at any point in time from December 9, 2008 through January 2011."

(2) The "Illinois Wage Payment and Collection Act Class" is defined as "All loan officers employed by American Bank & Trust Company in Illinois at any point in time from December 9, 2001 through January 2011."

(3) The "Breach of Contract Class" is defined as "All loan officers employed by American Bank & Trust Company at any point in time from December 9, 2006 through January 2011."

(4) The "Fraud Class" is defined as "All loan officers employed by American Bank & Trust Company at any point in time from December 9, 2006 through January 2011."

reclassifying its mortgage loan officers based on the DOL guidance. (Def.'s Statement of Facts ("DSOF") ¶ 58.)

Plaintiffs entered into employment agreements with ABT that provided that ABT would pay the loan officers commissions as a percentage of "revenue generated" by the loan officers in "personal production for end loans sold." (DRSOF ¶ 18.)[4] Plaintiffs claim that ABT subtracted "secondary gain" from the revenue generated on the loan before calculating commissions owed to Plaintiffs under the employment agreements, thereby reducing the base amount from which Plaintiffs' commissions were calculated. (PSOF ¶¶ 19–22.) ABT disputes that "secondary gain" was revenue generated by loan officers as contemplated by the employment agreements. (DRSOF ¶¶ 19–22.) It is undisputed, however, that "secondary gain" was not calculated into loan officers' commissions but rather was a "set margin of profit for the bank" that operated as income to ABT. (Pl.s' Ex. 38, Kaye Dep. Tr.[5] at 58:13–59:9; Pl.s' Ex. 4, Dollenbacher Dep. Tr. at 90:8–22.)

Plaintiffs claim that ABT's policy of not paying loan officers minimum or overtime wages violates the FLSA (Count I) and the IMWL (Counts II and III). Plaintiffs also claim that ABT's

---

[4] For example, ABT's employment agreements with named Plaintiffs Marc Kramer, Kiril Trajcevski, and Nyman Nyman's all provided: "Bank will pay to Employee commissions on personal production for end loans sold to the Secondary Market or Servicing Retained loans sold directly to Fannie May or Freddie Mac . . . . This commission is paid monthly as a percent of revenue generated providing the bank's current minimum buy price is obtained according to the following tiered compensation structure . . . ." (Pl.'s Statement of Undisputed Facts ("PSOF"), Ex. 34 at 35, (Kramer), 43 (Trajcevski), 63 (Nyman).)

[5] As a general matter, ABT argues that the Court should disregard Plaintiffs' exhibits that consist of deposition testimony from an Iowa state case against ABT involving similar claims. ABT cites the Seventh Circuit's decision in *Alexander v. Casino Queen, Inc.*, 739 F.3d 972 (7th Cir. 2014) to support its position. But in that case, the Seventh Circuit held that depositions from one case may be properly used at the summary judgment stage of another, if two conditions are met: (1) the deposition must satisfy the requirements of Federal Rule of Civil Procedure 56 for an affidavit or declaration—"*i.e.*, the testimony is based on personal knowledge and sets out facts that would be admissible at trial, and deponent is competent to testify on these matters;" and (2) the deposition transcripts "must be part of 'the record' in the present case . . . [t]o satisfy the second requirement, the plaintiffs [] needed to create a docket entry, with attachments, to ensure that the relevant [] materials were part of the record in the plaintiff's case." *Id.* at 978. With one exception, Plaintiffs have met these requirements and thus the Court will consider Plaintiffs' citations to deposition testimony in related state cases against ABT.

practice of "skimming" secondary gain off revenue generated by Plaintiffs violates the IWPCA (Count IV) and constitutes a breach of contract (Count V), fraud by misrepresentation (Count VI), and fraud by concealment (Count VII). Plaintiffs have moved for summary judgment on all counts. ABT has cross-moved for summary judgment on all counts except Count V.

## DISCUSSION

At the summary judgment stage, the Court must determine if a genuine dispute of material fact exists such that a reasonable jury could return a verdict for the nonmoving party. *See, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). The party seeking summary judgment must identify relevant portions from the pleadings, depositions, answers to interrogatories, admissions, or affidavits, which demonstrate the lack of any genuine material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the opposing party must respond by setting forth specific facts showing that there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 248. "[T]he trial judge's function is not [her]self to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. There is no such issue unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* In making this determination, the Court must view all evidence in the light most favorable to the party opposing the motion for summary judgment and draw all reasonable inferences in the nonmovant's favor. *See, e.g.*, *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir. 1990). The same standard applies to cross-motions for summary judgment. *See, e.g.*, *Int'l Bd. Of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). "Each motion is to be evaluated independently, and denial of one does not necessitate the grant of the other." *Dominguez v. Quigley's Irish Pub, Inc.*, 790 F. Supp. 2d 803, 810 (N.D. Ill. 2011).

I.  **Fair Labor Standards Act and Illinois Minimum Wage Law Claims**

The FLSA requires employers to pay their employees a federal minimum hourly wage, and to pay overtime wages to certain employees who work more than forty hours in a work week. *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173 (7th Cir. 2011); *see also* 29 U.S.C. § 207(a) ("[N]o employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours . . . specified at a rate not less than one and one-half times the regular rate at which he is employed."). Similarly, the IMWL "requires that employees be paid at least the Illinois state minimum wage for all hours worked, and that employees receive a wage of not less than one and one-half times their regular rate for all hours of overtime worked." *Dominguez*, 790 F. Supp. 2d at 811; *see also* 820 ILCS §§ 105/4, 1054(a). With respect to FLSA claims, "[t]he employee bears the burden of proving that she performed overtime work for which she was not properly compensated."*Kellar*, 664 F.3d at 173. In addition, "[t]o state a claim under the FLSA, [an employee] must show that [the employer] had actual or constructive knowledge of her overtime work." *Id.*; *see also Gaines v. K-Five Const. Corp.*, 742 F.3d 256, 270 (7th Cir. 2014) ("While an employer cannot slyly sit back in order to reap extra work without pay, it has no obligation to pay for work it did not know about and had no reason to know about."). "FLSA and IMWL claims are evaluated using the same general analysis." *Dominguez*, 790 F. Supp. 2d at 811.

Plaintiffs contend that they are entitled to summary judgment on their FLSA and IMWL claims because the undisputed facts show that by paying loan officers on a commission-only basis, ABT failed to pay minimum wage and overtime pay in violation of FLSA and IMWL. It appears undisputed that ABT paid Plaintiffs "by mostly commission." (Pls.' Ex. 9, Klaus Dep. Tr. att 76:16–19; Pls.' Ex. 11, Nyman Dep. Tr. at 89:18–20; Pls.' Ex. 14, Trajcevski Dep. Tr. at

5

14:20–22.)[6] It is also undisputed that, prior to January 2011, ABT classified loan officers as exempt from minimum wage and overtime requirements, and that as a result of this classification, ABT did not track hours worked by loan officers. (DRSOF ¶ 8.) Finally, ABT does not dispute that, prior to January 2011, it did not pay overtime. (DRSOF ¶ 9.)

With respect to their minimum-wage claim, Plaintiffs appear to rely on those facts alone to contend that they are entitled to summary judgment. Plaintiffs do not point to any testimony or other evidence suggesting that any Plaintiff was actually paid less than the applicable state minimum wage of $8.00 per hour.[7] ABT, on the other hand, points to testimony from named Plaintiff Matt Nyman that he made over $100,000 per year in income during his employment with ABT, as well as testimony from named Plaintiff Kiril Trajcevski that he made $90,000 in income in 2009 and was on track to make at least $100,000 when he left ABT mid-way through 2010. (DSOF ¶ 9 (citing DRSOF Ex. K, Nyman Dep. Tr. at 90:4–17; DRSOF Ex. B, Trajcevski Dep. Tr. at 118–119).) While ABT does not point to similar testimony for the remaining FLSA Plaintiffs or explain how these income levels tracked the hours worked by Plaintiffs, ABT has created an issue of material fact as to whether Plaintiffs were ever paid below minimum wage, and thus summary judgment on Plaintiffs' minimum wage claim under the FLSA and IMWL is inappropriate.

With respect to Plaintiffs' overtime claim, ABT does not dispute that, prior to January 2011, it did not pay overtime. (DRSOF ¶ 9.) Further, Plaintiffs have established that the named Plaintiffs and at least some FLSA Plaintiffs routinely worked in excess of 40 hours per week. (PSOF ¶ 10; DRSOF ¶ 10.) To prevail on summary judgment, however, Plaintiffs must also prove

---

[6] ABT disputes Plaintiffs' claim that ABT paid Plaintiffs on a "commission-only" basis, but points to testimony by ABT executives confirming that ABT paid on a "mostly commission or at a minimum largely commission" basis. (DRSOF ¶ 6 and Ex. O, Klaus Dep Tr. at 76:16–19.)

[7] The parties agree that, as of May 7, 2010, the Illinois minimum wage was $8.00 per hour. (DRSOF ¶ 12.)

that ABT had actual or constructive knowledge of the overtime work. *Kellar*, 664 F.3d at 173; *Gaines*, 742 F.3d at 270. Plaintiffs did not raise the issue of ABT's knowledge of overtime worked in their summary judgment memorandum or statement of facts. ABT thus argues in its cross-motion that it is entitled to summary judgment on this basis. In reply to ABT's motion, Plaintiffs first argue that they are not required on summary judgment to show that the defendant knew or should have known about overtime worked, citing the Eleventh Circuit's decision in *Reich v. Department of Conservation and Natural Sources*, 28 F.3d 1076, 1082 (11th Cir. 1994), and that, in any event, the evidence cited in Plaintiffs' statement of facts shows that ABT did know about overtime worked by loan officers. But the Seventh Circuit has made clear that to prevail on an overtime claim under the FLSA, a plaintiff must prove that the employer had actual or constructive knowledge of the overtime worked. *Kellar*, 664 F.3d at 173; *Gaines*, 742 F.3d at 270. The Eleventh Circuit's decision in *Reich* does not hold to the contrary. *Reich*, 28 F.3d at 1082 ("[I]n reviewing the extent of an employer's awareness, a court need only inquire whether the circumstances . . . were such that the employer either had knowledge [of overtime hours being worked] or else had the opportunity through reasonable diligence to acquire knowledge.") (internal quotations omitted).

      To support their argument that the undisputed facts do show that ABT knew of the overtime worked by its loan officers, Plaintiffs point to a May 2010 email discussion between ABT executives regarding the DOL's guidance reversing the previous Wage and Hour Opinion Letter that suggested mortgage loan officers met the qualifications to be exempt from minimum wage and overtime requirements under the FLSA. (Pls.' App'x of Exhibits, Ex. 38, Dkt. Nos. 589, 594.) In the email discussion, Chicago Market President James Allen states "[t]his will be HUGE if we have to pay them a wage and then factor in commissions." (*Id.*) Allen asks Regional Vice

President Jeff Gennarelli to recall previous research he had done on the issue, and Gennarelli replies that "my research shows we need to pay a salary of $425 a week to avoid overtime suits." (*Id.*) Plaintiffs suggest these statements establish that ABT knew that its loan officers were working overtime, however Plaintiffs do not point to any deposition testimony or other evidence to support this interpretation of the statement.

The Court declines to infer that this statement referencing results of prior, unexplained research from an unidentified time-period establishes that ABT knew its loan officers were working overtime. Further, that ABT knew that the DOL's guidance had changed—potentially requiring changes to ABT's classification of loan officers—is not the same as knowledge that ABT loan officers were in fact working overtime. The statements Plaintiffs identify do however create a genuine issue of material fact as to ABT's knowledge as to whether loan officers were working overtime, and summary judgment for either party is therefore inappropriate.

## II. FLSA Statute of Limitations

The parties have cross-moved for summary judgment on Plaintiffs' claim that the evidence demonstrates that ABT's violations were "willful" under the FLSA, such that the limitations period for bringing an action should be extended to three years. *See* 29 U.S.C. § 255(a) (providing for a two-year limitations period from the time of the accrual of the action, "except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued"). "An employer's violation of the FLSA is 'willful,' for purposes of determining the limitations period, if the employer either knew or acted with reckless disregard for whether its conduct was prohibited by the Act. Willful behavior is conduct that is more than simply negligent or unreasonable." *Sherman v. Premium Concrete Cutting, Inc.*, No. 01 C 7263, 2004 WL 1510030, at *3 (N.D. Ill. July 6, 2004) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128,

133 (1988); *see also Walton v. United Consumers Club, Inc.*, 786 F.2d 303, 308 (7th Cir. 1986) (describing willfulness as "usually it denotes some highly culpable mental state either actual knowledge that one's acts violate the law or reckless indifference to the law"). The plaintiff in a FLSA case bears the burden of establishing willfulness, which "requires proof that the defendant's actions were knowing and voluntary and that he knew or reasonably should have known that those actions violated the statute." *Id.* at 312 (internal quotations omitted).

To support their assertion that ABT's conduct was willful under the FLSA, Plaintiffs point to the same evidence discussed above in relation to Plaintiffs' argument that ABT knew its loan officers were working overtime. As discussed, this evidence establishes that ABT knew that in mid-2010, the DOL's guidance regarding whether loan officers were properly classified as exempt from FLSA minimum wage and overtime requirements had changed, potentially requiring changes to ABT's classification of loan officers, and creates an issue of material fact as to whether ABT knew that its loan officers were working overtime.

The Court finds as a matter of law that this evidence does not establish willfulness under the FLSA. It is undisputed that ABT's classification of loan officers as exempt from FLSA requirements was based on the DOL's guidance on the issue, and that when ABT discovered that the DOL reversed its guidance, ABT began discussing and investigating a potential change to its own classification, which was carried out by January 2011. (DRSOF ¶¶ 14–16.) This conduct does not exhibit the type of willfulness required by the statute. *See Walton*, 786 F.2d at 308; *Doden v. Plainfield Fire Prot. Dist.*, No. 94 C 6294, 1995 WL 699719, at *4 (N.D. Ill. Nov. 24, 1995) (denying plaintiff's summary judgment motion with respect to its argument that defendant's conduct was willful under the FLSA and subject to the three-year statute of limitations where it was undisputed that defendant reviewed FLSA materials, discussed the matter

with peer institutions, and sought legal counsel to determine its FLSA obligations). The Court therefore holds that the FLSA's two-year statute of limitations applies. As a result, Defendants are entitled to summary judgment on the claims of FLSA opt-in plaintiffs who filed their written consent to join the collective outside of FLSA's two-year statute of limitations. *See, e.g.*, *Young Chul Kim v. Capital Dental Tech. Lab, Inc.*, 279 F. Supp. 3d 765, 769 (N.D. Ill. 2017) ("In FLSA collective actions, potential opt-in plaintiffs do not become parties to a suit until they file written consent with the court. The statute of limitations therefore continues to run on opt-in plaintiffs' claims until they give their consent to join the suit.").

### III. Illinois Wage Payment and Collection Act Claim

The IWPCA requires employers to pay employees all wages earned during the previous semi-monthly pay period. 820 ILCS 115/3. The statute defines "wages" as "any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." *Id.* § 2. In other words, "[t]he principal purpose of the Act is to ensure that employers honor the wage and payment terms of their employment agreements." *Cohan v. Medline Indus., Inc.*, 170 F. Supp. 3d 1162, 1175 (N.D. Ill.), *aff'd*, 843 F.3d 660 (7th Cir. 2016); *see also Gallardo v. Scott Byron & Co.*, No. 12-cv-7202, 2014 WL 126085, at *14 (N.D. Ill. Jan. 14, 2014) ("The IWPCA requires that the employer honor his contract; it does not, however, confer rights to compensation that are absent from the employee's contract or employment agreement."); *Jaramillo v. Garda, Inc.*, No. 12 C 662, 2012 WL 1378667, at *2 (N.D. Ill. Apr. 20, 2012) ("[T]he IWPCA merely demands that employers pay whatever wages were agreed to."). "To prevail under the Act, a plaintiff must show that he had a valid contract or employment agreement entitling him to the claimed payments." *Cohan*, 170 F. Supp. 3d at 1176 (citing *Hess v.*

*Kanoski & Assocs.*, 668 F.3d 446, 452 (7th Cir.2012); *Stark v. PPM America, Inc.*, 354 F.3d 666, 672 (7th Cir.2004)). That is, a plaintiff "needs to establish a manifestation of mutual assent from **both** parties about the purported terms of his employment agreement." *Schneider v. Ecolab, Inc.*, No. 14 C 01044, 2015 WL 1402615, at *5 (N.D. Ill. Mar. 25, 2015) (emphasis in original) (internal quotation marks omitted).

Plaintiffs contend that it is undisputed that "secondary gain" is "revenue generated" as contemplated by loan officers' employment agreements, and thus ABT violated the IWPCA by failing to include secondary gain in Plaintiffs' commission calculations. But Plaintiffs do not point to any evidence to support their assertion that secondary gain should have been properly included in "revenue generated" as that term was contemplated by the employment agreements.[8] Indeed, there is no dispute that "revenue generated" is not defined by the employment agreements,[9] nor is "secondary gain" mentioned in the employment agreements. It is also undisputed that "secondary gain" on a loan was not calculated into loan officers' commissions but

---

[8] To support their assertion, Plaintiffs point to testimony from ABT executive Kaye in a case in Iowa state court with similar claims where Kaye testified that based on his understanding of the Iowa plaintiff's employment agreement, it was correct that "the revenue generated he should have been paid on pursuant to that agreement was both the secondary grain and the premium income" (PSOF ¶ 23 (citing Ex. 36, Kaye Dep. Tr. at 54:12–17).) As pointed out by ABT, Kaye went on to testify that his knowledge of the Iowa plaintiff's agreement was based on talking to ABT executive Brian Boyles. (Pl.s' Ex. 36, Kaye Dep. Tr. at 54:23–55:1.) This testimony does not meet the requirements of Rule 56 or the Seventh Circuit's decision in *Alexander v. Casino Queen, Inc.* that to be properly used at the summary judgment stage, a deposition transcript from another case must satisfy the requirements of Federal Rule of Civil Procedure 56 for an affidavit or declaration—"*i.e.*, the testimony is based on personal knowledge and sets out facts that would be admissible at trial, and deponent is competent to testify on these matters." 739 F.3d 972, 978 (7th Cir. 2014). In any event, Kaye's testimony in the Iowa case is about a plaintiff and an employment agreement not before the Court in this case. The Court thus declines to rely on this evidence to find that Plaintiffs have established that "revenue generated" as contemplated by the Plaintiffs' employment agreements in this case properly included "secondary gain."

[9] The employment agreements state that "[ABT] will pay to Employee commissions on personal production for end loans sold to the Secondary Market or Servicing Retained loans sold directly to Fannie Mae or Freddie Mac . . . This commission is paid monthly as a percent of revenue generated provided the bank's current minimum buy price is obtained according to the following tiered compensation structure . . ."

rather was a "set margin of profit for the bank" that operated as income to ABT. (Pl.s' Ex. 36, Kaye Dep. Tr. at 58:13–59:9; Pl.'s Ex. 4, Dollenbacher Dep., 90:8–22.).

Plaintiffs state in their statement of facts that it is undisputed ABT "unilaterally subtracted secondary gain from commissions without telling loan officers, which was a margin put in place to skim funds from the revenue generated by the loan officers upon which their commission was calculated." (PSOF ¶ 19.) But to support this claimed fact, Plaintiffs point to general statements from ABT executives stating that secondary gain was a margin for the bank. (Pl.'s Ex. 36, Kaye Dep. Tr. at 58:13–59:9; Pl.s' Ex. 35, Mann Dep. Tr. at 33:11–19.) Similarly, Plaintiffs claim that it is undisputed that "secondary gain was revenue that had been generated by the loan officers." (PSOF ¶ 31.) But again, the evidence that Plaintiffs cite for this proposition simply states that secondary gain represented income to ABT. (Pl.s' Ex. 4, Dollenbacher Dep. Tr. at 90:8–10.)[10]

At the summary judgment stage, a trial court may interpret a written contract as a matter of law, where the court decides that the contract is unambiguous as a matter of law. *See, e.g.*, *Hickey v. A.E. Staley Mgf.*, 995 F.2d 1385, 1389 (7th Cir. 1993) (internal citations and quotations omitted). Under Iowa law, which the parties agree applies to the employment agreements at issue, a contractual clause is ambiguous if "the language is fairly susceptible to two interpretations." *Shelby Cty. State Bank v. Van Diest Supply Co.*, 303 F.3d 832, 835 (7th Cir. 2002) (quoting *DeJong v. Sioux Ctr., Iowa*, 168 F.3d 1115, 1119 (8th Cir. 1999). "[T]he interpretation of an ambiguous contract presents a question of fact, thereby precluding summary judgment." *Hinshaw v. Ligon Indus., L.L.C.*, 551 F. Supp. 2d 798, 808–09 (N.D. Iowa 2008) (quoting *Rick v. Sprague*,

---

[10] *See also, e.g.*, PSOF ¶ 35 (claiming that it is undisputed Plaintiffs "were not paid their promised commissions based upon secondary gain which [ABT] executives have admitted was revenue and thereby knowingly permitted and/or intentionally acted to deceive and deprive Plaintiffs of their rightful wages and compensation," with citation to deposition testimony explaining only that "secondary gain would be based on the dollar amount sold that the investor paid you and the secondary gain would be the difference in what you charged to the customer") (citing Mann Dep. Tr. at 33:1–6).

706 N.W.2d 717, 723 (Iowa 2005)); *W. Liberty Tel. Co. v. CopperCom, Inc.*, 805 F. Supp. 2d 669, 680 (S.D. Iowa 2009) (citing *Pillsbury Co. v. Wells Dairy, Inc.*, 752 N.W.2d 430, 436 (Iowa 2008)).

As discussed, the employment agreements do not define "revenue generated" nor do they discuss "secondary gain." Nor do Plaintiffs cite any evidence to indicate how ABT calculated revenue generated, or its practice for calculating secondary gain. The closest statements to explaining ABT's practices surrounding secondary gain are ABT executive Boyles' testimony in a related state case that,

> the true secondary gain and when you deliver best efforts, you don't know until you get the funding advice from the investor, so if I expected 1014, which include the 40 basis points margin, and we happen to catch it on a good day or we lock a group of loans they were providing and incentive or whatever the case is and the funding advice showed 1015, the 10 basis points is your true secondary gain.

(Pl.'s Ex. 37, Boyles Dep. Tr. at 54:4–17; *see also* Pl.'s Ex. 35, Mann Dep. Tr. at 53:1–53:4 (testifying that "secondary gain would be based on the dollar amount sold that the investor paid you and the secondary gain about be the difference in what you charged to the customer"); *id.* at 43:1–8 (testifying "the revenue associated with secondary gain cannot be generated unless a loan is closed" and that "by closing the loan it enables the bank to generate that revenue that is secondary gain"). But these statements do not establish how secondary gain was calculated or ABT's practice for calculating it. Without such information, the Court cannot determine as a matter of law whether "revenue generated" as contemplated by the employment agreements properly included secondary gain. The Court therefore declines to interpret the employment agreements as a matter of law. Both parties' motions for summary judgment on the IWPCA claims are therefore denied.[11]

---

[11] Although ABT purports to cross-move for summary judgment on Plaintiffs' IWPCA claim, the basis of ABT's motion is that Plaintiffs' motion for summary judgment must be denied because the term "revenue

## IV. IWPCA Enhanced Damages

In its motion for summary judgment, ABT argues that the enhanced damages that Plaintiffs seek under the IWPCA, including the addition of a 2% interest penalty, cannot be applied to Plaintiffs' claim because the provision allowing such damages was added to the IWPCA by amendment in 2011. *See* 820 ILCS 115/14/(a) ("Any employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to recover . . . the amount of any such underpayments and damages of 2% of the amount of any such underpayments for each month following the date of payments during which such underpayments remain unpaid. In a civil action, such employee shall also recover costs and all reasonable attorney's fees.");[12] P.A. 96-1407 § 10, eff. Jan. 1, 2011.

As both parties point out (albeit with conflicting interpretations), the Court addressed the 2011 amendment in its decision granting class certification, holding that the amendment authorizing recovery of 2% monthly interest on unpaid wages may not be applied retroactively and that any calculation of damages regarding such interest would be "easily limited to post-January 1, 2011 unpaid wages." (Mem. Op. and Order at 11 n.6, Dkt. No. 581.) Plaintiffs contend that the Court's holding indicates that Plaintiffs may collect the statutory 2% interest on wages that remained unpaid after January 1, 2011, while ABT suggests that the ruling indicates that Plaintiffs may collect the statutory 2% interest on wages for any unpaid wages accrued post-January 1, 2011.

---

generated" as contemplated by the employment agreements is "highly disputed." Thus, to the extent ABT purports to move for summary judgment, its motion is denied.

[12] In its memorandum in support of summary judgment, ABT incorrectly quoted the amendment to read "[a]ny ***new*** employee not timely paid wages . . . ." That incorrect wording significantly changes the meaning of the amendment. The Court will assume that this was an innocent error by ABT and caution counsel for ABT to ensure that any quotations and citations are accurate before filing any future papers.

Plaintiffs' approach is the logical one, given that, as ABT indicates, Plaintiffs' damages disclosures, and the contracts upon which their IWPCA claims are based, all involve claims for pre-2011 unpaid wages. *See also Brandl v. Superior Air-Ground Ambulance Service, Inc.*, No. 9 C 06019, 2012 WL 7763427, at * (N.D. Ill. Dec. 7, 2012) ("The amendment adding the statutory 2% assessment was effective January 1, 2011, and mandates application of that assessment for each month in which wage underpayment remains unpaid. The amount owed for January 26, 2009 remained unpaid through the jury's verdict, and the Court sees no reason that the damages provision would not apply for at least the months following its effective date."). As explained by the court in *Brandl*, "[t]hat the debt owed predates the damages provision does not make application of that provision following the effective date 'retroactive;' the failure to pay the wages owed was continuing and prospective application of the damages assessment in no way subjects the defendant's original decision not to pay the wages to a damages assessment greater than could have been imposed at the time of that decision." *Id.* The Court therefore holds that, though ABT's liability under IWPCA is inappropriate for summary judgment, if Plaintiffs ultimately prevail on their IWPCA claim, they are entitled to collect the statutory 2% interest on wages that remained unpaid after January 1, 2011.

### V. Breach of Contract Claim

Plaintiffs also claim that ABT's practice of "skimming" secondary gain breached the employment agreements between the parties. Because Plaintiffs' argument is premised on the same disputed facts and ambiguous contract terms as discussed above, the Court denies summary judgment on Plaintiffs' breach of contract claim for the same reasons.

### VI. Fraud Claims

Plaintiffs also claim that ABT committed fraud by misrepresentation and fraud by omission by entering into employment agreements to pay Plaintiffs based on revenue generated despite ABT's practice of "skimming" secondary gain. Because the Court finds that there are disputed facts regarding whether secondary gain was appropriately considered revenue generated as that term was contemplated by the employment agreement, summary judgment on Plaintiffs' fraud claims is denied.

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment (Dkt. No. 583) and Defendants' motion for summary judgment (Dkt. No. 608) are both denied.

ENTERED:

Dated: September 30, 2018

_____
Andrea R. Wood
United States District Judge